Roland BELTON, Appellant,

v.

UNITED STATES of America, Appellee.

No. 13690.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 24, 1958.

Decided May 15, 1958.

Mr. John P. Arness, Washington, D. C. (appointed by this Court) for appellant.

Mr. Harry T. Alexander, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., Lewis Carroll and Arthur J. McLaughlin, Asst. U. S. Attys., were on the brief, for appellee.

Before EDGERTON, Chief Judge, PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges, sitting en banc.

FAHY, Circuit Judge, announces the judgment of the court and delivers the following opinion in which EDGERTON, Chief Judge, and BAZELON and WASHINGTON, Circuit Judges, join.

In August 1949 one Lewis Crowder met his death as a result of knife wounds inflicted by appellant. The grand jury indicted appellant for second degree murder, indicating their conclusion that the homicide was not accompanied by premeditation and malice aforethought, essential elements of first degree murder.[1] The trial did not take place until September 1954, appellant having left the jurisdiction upon learning of Crowder's death and not having been returned until March 1954. Appellant was found guilty as charged and the case is before us as a result of proceedings subsequently set forth in this opinion.

The prosecution called but one eye witness, Wallace Brown. He supported appellant's claim of self defense. He said he saw Crowder, who was a much taller and heavier man, slapping and kicking appellant, who "was trying to defend himself and fight off from him." He saw a small penknife in appellant's hand but did not see him cut Crowder. The prosecution claimed surprise and sought to impeach its witness by the use of a writ-

---

1. Except in certain situations under 31 Stat. 1321 (1901), as amended, § 22–2401, D.C. Code (1951), not here pertinent.

ten statement represented to have been made by Brown in August 1949. A conference with the court ensued at the bench. The court considered and rejected the claim of surprise. It appeared to the court that the prosecuting attorney had recently interviewed Brown and knew he would not adhere to the statement, whatever it was. The effect of this ruling was to prevent the prosecution from attacking the testimony of the witness it had itself called as one worthy of belief.

■ Though section 14–104, D.C.Code (1951),[2] allows an exception to the general rule that one cannot impeach his own witnesses by the use of previously made contradictory statements,[3] to come within that exception actual surprise must be found. Young v. United States, 94 U.S.App.D.C. 62, 69, 214 F.2d 232, 238.[4]

■ The prosecution did not abide by the court's ruling that it could not impeach its own witness. Over repeated defense objections, repeatedly sustained by the court, the prosecution sought by questioning Brown to convince the jury that he had given a statement in August 1949 that was inconsistent with his sworn testimony at the trial. The following questions asked Brown illustrate the tactics used:

"Doesn't it say in the statement you saw him cut the man?

[Objection sustained.]

"You say you didn't make that statement to the police?

[Objection sustained.]

"Read the statement and see whether you made it.

[Objection sustained.]

"Didn't you say, when you told me what happened—

[Objection sustained.]

"Did you tell me that the next day when you saw Belton he showed you a knife? A. Showed me a knife?

"Didn't I read that statement to you?

[Objection sustained.]"

At one point when the court sustained the objection, saying the prosecutor was attempting to impeach his own witness the prosecutor said, apparently also in the hearing of the jury:

"No. He is trying to say an entirely different story, say something different, and I think I can show in the interview what happened."

The prosecutor also referred to a conversation he had had with the witness on the previous day, and, still over objection, which was sustained, stated in the hearing of the jury,

"I think I am entitled to show his conversation in this case by the wit-

2. Section 14–104, 32 Stat. 540 (1902) reads as follows: "Whenever the court shall be satisfied that the party producing a witness has been taken by surprise by the testimony of such witness, such party may, in the discretion of the court, be allowed to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to such party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause * * *."

See Wheeler v. United States, 93 U.S. App.D.C. 159, 211 F.2d 19; Smith v. United States, 57 App.D.C. 71, 17 F.2d 223.

3. 3 Wharton, Criminal Evidence § 948 (12th ed. 1955):

After presenting a witness to the jury as worthy of belief, a party cannot attack the witness and ask the jury to disbelieve his testimony if it is unfavorable. To that extent, a party is bound by the answer of his own witness, and the general rule obtains in criminal cases that a party cannot impeach his own witness, even though the party thus precluded is the government.

And see, Hickory v. United States, 151 U.S. 303, 309, 14 S.Ct. 334, 38 L.Ed. 170. Compare 3 Wigmore, Evidence §§ 896–905 (3d ed. 1940).

4. See 3 Wharton, op. cit. supra § 953; Underhill, Criminal Evidence § 421 (4th ed. 1935). For an excellent discussion of the federal law on the overall point of impeaching one's own witness in a situation of surprise see United States v. Michener, 3 Cir., 152 F.2d 880.

ness, that I should be entitled to show if he said something that is not true."

Again,

"Well, now, you remember, as I say—you don't deny signing this statement, do you?

[Objection sustained.]"

None of these references to a prior statement which was not in evidence— none of these prejudicial implications of the prosecutor himself—was permissible. This improper conduct was renewed in his summation when the prosecutor said to the jury that if appellant had stood trial in August 1949 "the Government would have sufficient evidence to convict him * * *." In characterizing the prosecutor's conduct as improper we do not assess his motives. We use the adjective to describe the effect of his conduct upon the fairness of the trial.

Appellant took the stand. He testified that while he was asleep in a yard the deceased woke him and asked him to walk outside which he did. The deceased then asked him if he had made a particular statement about the deceased going with a certain married woman. Appellant denied having done so. He testified that then the deceased "grabbed me by my collar, called me a damn liar and said I did, and he started beating me, and he kept beating me. I could not run. I could not get away from him." He continued to describe the fight, said he was being kicked, managed to get out his knife, he did not know how, but deceased kept kicking him in the lower part of the stomach and on the leg and beating him and he started fighting back. He did not know how long it was before Brown came up.

There were a number of knife wounds on decedent, the most serious of which appears to have been a cut in the throat.

In view of the evidence which was properly before the jury it is impossible to avoid the conclusion that the conduct of the prosecution might have affected the verdict of the jury, on the issue of self-defense or the degree of homicide,

by leading them to believe that evidence against appellant of a damaging character existed which the court would not permit the jury to hear. This grew out of tactics which violated the rulings of the court and appellant's right to a trial on the evidence given under oath from the witness stand rather than given in effect by the prosecutor from counsel table.

The United States contends, however, that the conviction, thus impaired, must stand because no appeal from the judgment is properly before us.

■ We think the appeal is here for us to decide. The verdict of the jury was rendered September 10, 1954. Judgment thereon was entered October 1, 1954. In the meantime, on September 14, 1954, there was filed in the office of the Clerk of the District Court a letter from appellant requesting *inter alia* that he be granted the privilege of "receiving an appeal as I am without funds to pay the cost of court * * *." This was an adequate and timely notice of appeal. Rule 37(a) (2) F.R.Crim.P., 18 U.S.C.; Boykin v. Huff, 73 App.D.C. 378, 121 F.2d 865; Williams v. United States, 88 U.S. App.D.C. 212, 188 F.2d 41; accord, Shannon v. United States, 93 U.S.App.D.C. 4, 206 F.2d 479; and see Kirksey v. United States, 94 U.S.App.D.C. 393, 395, note 2, 219 F.2d 499, 500, note 2. This court thus obtained jurisdiction to review the judgment of conviction. The fact that the notice of appeal was received by the clerk after the verdict and before entry of judgment thereon is an irregularity which does not affect substantial rights and should be disregarded. Lemke v. United States, 346 U.S. 325, 74 S.Ct. 1, 98 L.Ed. 3.

■ Rule 39(c) F.R.Crim.P. requires, however, that after the appeal is taken the record shall be filed and the proceedings docketed in this court within forty days from the date the notice of appeal is filed in the District Court. The record was not filed and the proceedings were not docketed within forty days from the notice of appeal of September 14,

1954.[5] But this did not oust the jurisdiction which had become vested in this court. Rule 45(b)(2) explicitly provides that for cause shown we may upon motion permit an appeal to be perfected after the expiration of the time specified in Rule 39(c), if the failure to do so within that time was the result of excusable neglect.[6] The neglect was excusable. The District Court treated appellant's letter of September 14, 1954, as a request for leave to appeal in forma pauperis and denied it as such. This we have no doubt indicated to appellant, an illiterate pauper then in confinement, that his request for an appeal had been denied. See Boykin v. Huff, supra. It is only now that we decide that this letter constituted a notice which vested jurisdiction of the appeal in this court. This decision comes about at this late date in the following circumstances: In August 1955 appellant began to file a series of motions in the District Court under 28 U.S.C. § 2255 (1952), collaterally attacking the judgment of conviction. This led finally to our allowance of an appeal from the denial by the District Court of the § 2255 motion he had filed July 10, 1956. In connection with that appeal we appointed counsel to represent appellant. This in turn led to the disclosure that by reason of the letter to the Clerk of the District Court of September 14, 1954, we were possessed of jurisdiction of an appeal from the original judgment of conviction itself, though the appeal had not been perfected in a timely manner. Since we only now reach this decision that we have jurisdiction of the direct appeal we think it is not permissible for us to

hold that uncounseled and imprisoned appellant should have known in the fall of 1954 what we only now decide, and, in addition, should have known that the rules required him to perfect within forty days from September 14, 1954, an appeal which we cannot say he even knew he had. After he was sentenced October 1, 1954, appellant was without counsel until this court appointed counsel for him November 20, 1956. See Blunt v. United States, 100 U.S.App.D.C. 266, 244 F.2d 355.

Aside from the question of excusable neglect on the part of appellant in perfecting the appeal within the usual time we have reached the merits of the appeal upon another and independent ground. Rule 39(a), set forth in the margin,[7] places under our "supervision and control" the "proceedings on appeal." Within this supervisory authority this court has held that we have the power to consider an appeal on a record filed out of time, once we have obtained jurisdiction by the filing of a notice of appeal within time, as was here done. The late Chief Judge Stephens stated the applicable principles in a case where the court rejected the claim that the delay was due to excusable neglect within the meaning of Rule 45(b)(2):

"[I]n a criminal case in which a sentence of imprisonment is involved, there is a public interest against denial of consideration on appeal of substantial questions as to the lawfulness of the conviction. For if the conviction is erroneous it is abhorrent to justice that a defendant shall

5. The record was filed January 23, 1957, and supplemented June 25, 1957.

6. No formal motion was filed under Rule 45(b)(2) but appellant in brief and oral argument requested that we consider the appeal on the merits notwithstanding lateness under the Rule in filing the record and docketing the appeal in this court. This is sufficient. See Jordan v. United States District Court, 98 U.S.App.D.C. 160, 163, note 3, 233 F.2d 362, 365, note 3, reversed on other grounds, 352 U.S. 904, 77 S.Ct. 151, 1 L.Ed.2d 114.

7. F.R.Crim.P. 39(a):
"(a) Supervision in Appellate Court. The supervision and control of the proceedings on appeal shall be in the appellate court from the time the notice of appeal is filed with its clerk, except as otherwise provided in these rules. * * *"
Of course the same supervision resides here when we have obtained jurisdiction of an appeal and the record is on file with our clerk, *as in the present case.*

nevertheless suffer such a penalty for the crime charged. The Supreme Court has on this account vested the United States Court of Appeals with discretion to consider and determine questions on appeal notwithstanding failure of counsel to make due compliance with the usual procedural requirements. This discretion may be exercised either on application of a party or by the court *sua sponte*."

Christoffel v. United States, 88 U.S.App. D.C. 1, 6, 190 F.2d 585, 590.

Chief Judge Stephens quoted the Supreme Court's reference in Forte v. United States, 1937, 302 U.S. 220, 223–224, 58 S.Ct. 180, 182, 82 L.Ed. 209,[8] to the "full responsibility" of the Court of Appeals "for the exercise of a reasonable control over all the proceedings relating to the appeal," and said that the court lost none of its power to determine what the interests of justice required "by reason of the fact that the question [of conformity to the rules] was not brought to its attention until the court had heard argument and reached a decision upon the assumption" that procedural requirements had been met.

█ Thus it is clear that once this court has jurisdiction of an appeal the procedural Rules, though designed for the expeditious and orderly progression of a case, contain within themselves provisions which prevent imprisonment of the court within rigid time schedules that would defeat the interests of justice. And of course the fact that appellant has long been in confinement cannot be ground for denying relief under the principles set forth in Christoffel. On the contrary. While remembering that the administration of criminal justice by appellate as well as other courts must be within the law which includes those rules of procedure that are binding, we must also not forget that, subject to these limitations, it is never too late to rectify serious error. Were illustration necessary it was furnished recently by Moore v. State of Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167. There a motion for a new trial was filed some 12 years after a plea of guilty had been accepted by a state court. Seven years later, or 19 years after the plea had been accepted, the case was decided by the Supreme Court. The Court held that the plea of guilty had been invalidly accepted and accordingly reversed the denial of the motion for a new trial. The basic question was whether the accused had waived his right to counsel.

█ In view of our disposition of the case we do not reach the questions raised on the appeal from denial of the § 2255 motion filed July 10, 1956. That appeal must now be dismissed as moot.

Reversed and remanded.

PRETTYMAN, Circuit Judge, with whom BURGER, Circuit Judge, joins, concurring in the result.

I do not agree that the neglect in failing to file the record, or in the alternative to bring the matter to the attention of this court, for so long a time was excusable, under the circumstances shown, within the meaning of Rule 45(b) (2). But I agree that this case calls for the exercise of the supervisory power of the court under the doctrine of the Christoffel case. I also agree that the judgment of conviction should be reversed.

I agree with Judge Miller's discussion of the Section 2255 problem, with the understanding that the discretion

8. Decided under Rule IV of the earlier Rules of Practice and Procedure in Criminal Cases promulgated by the Supreme Court May 7, 1934, 292 U.S. 661. Rule IV, said by Chief Judge Stephens, 88 U.S.App.D.C. at page 7, 190 F.2d at page 591, note 7, to parallel, so far as pertinent to Christoffel, present Rule 39(a), reads in part:

"From the time of the filing with its clerk of the duplicate notice of appeal, the appellate court shall, subject to these rules, have supervision and control of the proceedings on the appeal, including the proceedings relating to the preparation of the record on appeal."

vested in a district court is subject to review for abuse; but I do not reach the question.

WILBUR K. MILLER, Circuit Judge, with whom DANAHER and BASTIAN, Circuit Judges, concur, dissenting.

In a fight which took place August 2, 1949, Roland Belton stabbed one Lewis Crowder and inflicted wounds from which death resulted eight days later. Belton was indicted September 6, 1949, for second degree murder [1] but fled the jurisdiction and was not apprehended until March 2, 1954. He was arraigned ten days later and pleaded not guilty. Counsel were appointed to represent him and trial was set for April 26, 1954. On March 15, employed counsel entered an appearance. The two attorneys theretofore appointed were later permitted to withdraw.

After five continuances—three for the Government and two for the appellant, all of which were properly granted for good reason—Belton was brought to trial September 8, 1954, was found guilty as charged, and on October 1, 1954, was sentenced to imprisonment for a term of from seven to 21 years.

Although he was then still represented by competent employed counsel, from his cell in the District jail Belton wrote [2] a letter to the Clerk of the District Court which was received and filed September 14, 1954. He had acted in self-defense, he said, and had been unjustly convicted in an unfair trial. He asked that the matter be brought to the attention of the trial judge (Judge F. Dickinson Letts) "and grant me the privilege of receiving an appeal as I am without funds to pay the cost of court, that I may proceed in forma pauperis * * *." Treating the letter as a motion for leave to proceed on appeal without prepayment of costs, Judge Letts found and certified that the appeal was not taken in good faith and therefore denied the motion.[3] In the meantime appellant's counsel filed (September 16) a motion for a new trial, which was denied October 1, the day of sentence.

Judicial generosity now treats Belton's letter of September 14, 1954, as a notice of appeal from the judgment of conviction, although it fell far short of satisfying the requirements of Rule 37(a) (1) of the Federal Rules of Criminal Procedure. This tenuous appeal was not perfected, but was completely abandoned by the appellant, as will appear hereafter; but it is now revived by a majority of this court as a basis for substituting their judgment for that of the jury, and granting Belton a new trial. This probably means that he is freed of the murder conviction, for there is little chance that, after a lapse of nine years, the Government will be able to make out a case on a new trial. I am unwilling to agree to this procedure.

It cannot be disputed that the appeal was not perfected in time. Rule 39(c)

---

1. This is seized upon by the majority as showing the grand jury concluded Belton did not have malice aforethought. They say in their opinion, "The grand jury indicted appellant for second degree murder, indicating their conclusion that the homicide was not accompanied by premeditation and malice aforethought, essential elements of first degree murder." The majority err, for § 22-2403, D.C.Code (1951), defines second degree murder as follows:

    "Whoever with malice aforethought, except as provided in sections 22-2401, 22-2402, kills another, is guilty of murder in the second degree."

Contrary to the majority opinion, the grand jury concluded that the killing was done with malice aforethought.

2. Belton cannot write except to sign his name. He found a draftsman in the jail who prepared the letter for him.

3. 28 U.S.C. § 1915 includes the following: "An appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith." There was no further effort to obtain leave to appeal from the conviction in forma pauperis until appointed counsel moved to enlarge the issues in the limited appeal we finally allowed. This motion was not filed until May 2, 1957.

requires that "The record on appeal shall be filed with the appellate court and the proceeding there docketed within 40 days from the date the notice of appeal is filed in the district court * * * ." Thus it was necessary for Belton to file the record here within 40 days after October 1, 1954. He did not do so and did not during that time ask for an extension. This failure justifies, if it does not require, dismissal of the appeal unless we exercise the discretion committed to us by Rule 45(b) (2) "upon motion [to] permit the act to be done after the expiration of the specified period if the failure to act was the result of excusable neglect * * * ."

I do not think appellant's neglect was excusable. Trial counsel informed him that his employment would end October 1, 1954, the day of sentence. His services of course remained available until that time, but Belton wrote the letter of September 14 apparently without consulting him. He had ample opportunity to inquire of counsel what further steps he must take on appeal and when he must take them. He seems to have preferred to rely on himself and his adviser at the District jail. I think that neglecting to file the record within 40 days was not excusable and that therefore we do not have the discretion to enlarge the time which Rule 45(b) (2) gives us "if the failure to act was the result of excusable neglect." The appeal from the conviction perhaps noted by the letter filed September 14, 1954, was therefore not perfected, and should be dismissed.

In addition to holding that Belton's neglect was excusable, the majority attempt to justify their action by citing Christoffel v. United States, 1950, 88 U.S.App.D.C. 1, 180 F.2d 555. Their reliance on that case seems to me to be misplaced. In it the delay was only a matter of a few days, while here it was prolonged over a period of more than three years. Nor was Belton "uncounseled," although the majority so characterize him. He was represented, as I have said, by experienced employed counsel who could have advised him, and no doubt did so, of the time in which the appeal must be perfected. In addition to that, he had available in the penal institutions the services of what Judge Bennett Champ Clark used to call "guardhouse lawyers" who are well aware of the requirements of the Criminal Rules but who chose to concentrate on § 2255.

In his separate dissenting opinion Judge Bastian has dealt adequately with the alleged misconduct of the prosecuting attorney relied upon by the majority as a reason for reversal, so I shall not discuss that matter further.

The case is really here on the limited appeal we finally—and I think improvidently—allowed from the sentencing court's denial of the last of several motions to vacate sentence filed by Belton under 28 U.S.C. § 2255. I detail here the several steps taken by Belton after his conviction to show how completely he abandoned the appeal noted on September 14, 1954, and devoted himself exclusively to attacks upon the sentence; and also for the purpose of determining the only issues actually before the court. Section 2255 reads: [4]

"[1] A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"[2] A motion for such relief may be made at any time.

"[3] Unless the motion and the files and records of the case conclusively show that the prisoner is en-

4. In reproducing the section I have numbered its provisions for convenient ref-erence. The numbers do not appear in the Code.

titled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

"[4] A court may entertain and determine such motion without requiring the production of the prisoner at the hearing.

"[5] The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner.

"[6] An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

"[7] An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention."

After being sentenced October 1, 1954, Belton was silent until August 8, 1955, when he began a barrage of applications by filing his first motion under § 2255. The grounds alleged were these: (1)

that Belton "in 'self defense', was forced to use a small knife, (pen knife) wherein the deceased came in contact with such knife and was cut twice"; (2) that "in order to have been charged with any degree of murder * * * *the deceased had to die within 3 days or 72 hours,* after being injured or cut with a knife. Furthermore there had to be jotted [*sic*] into use a '*dangerous weapon*' and, an ordinary pocket knife is NOT A DANGEROUS WEAPON"; (3) that Belton did not flee to avoid any felony charge; that his arrest in Virginia was null and void "and no warrant of removal could be legally used to bring the defendant into District of Columbia as no felony had been committed; and, no murder had been committed by defendant"; (4) "The law requires in trials that involve Murder, the defendant be given not less than two competent lawyers to defend him. There existed but one lawyer, and, he was incompetent, and assisted the government, instead of his client."

September 21, 1955, Judge Letts found and certified that the motion and the files and records of the case conclusively showed the movant was entitled to no relief, and so denied the motion without a hearing, as permitted by paragraph [3] of § 2255. Belton did not file a notice of appeal from this order in the District Court, and did nothing there or here which indicated a desire to appeal from it.

October 17, 1955, Belton filed another motion under § 2255. This time he abandoned all the grounds stated in the first motion except the alleged incompetence of trial counsel, to which he added (a) that he did not receive a copy of the indictment, and (b) that the United States Attorney failed to call certain eyewitnesses to testify, although he knew their identity and could have called them. This motion was similarly denied October 21, 1955. October 29, 1955, Belton moved for a rehearing without stating grounds, which was denied November 8, 1955.

November 17, 1955, Belton filed in the District Court an application for leave to proceed without prepayment of costs in

which he asserted he was convicted without proper representation of counsel, that he "was tried and convicted five years after the alleged offense, when the prosecution knew or should have known of the whereabouts of the defendant," and that "the defendant could and now can prove his innocence, if his witnesses are subpoena [*sic*] into court." This application was denied November 22, 1955.

December 19, 1955, Belton filed in this court a petition for leave to proceed on appeal in forma pauperis from the order of the District Court of November 22, 1955. In it he alleged, among other things, that the "trial judge stated a legal conclusion, that the appeal was not taken in good faith, but failed to certify in writing facts upon which such a conclusion at law could be or was, based as required by Section 1915 of Title 28, U. S. Code * * *." January 26, 1956, this court denied the petition.

February 20, 1956, Belton filed another motion under § 2255 on the ground of newly discovered evidence. He attached an affidavit by one James Le Grand. The affiant said that on August 2, 1949, he was sitting in an automobile in front of the premises where the killing occurred; that Belton was on the front steps asleep and he saw Crowder "snatch" Belton to his feet and kick him.

"In the struggle Belton managed to get a small pocket knife from his pocket and open it. The two men were still locked together. I saw Belton swipe at Crowder's neck. But in the melee I could not see everything that was taking place, but I did see one Wallace 'Mutt' Brown, come out of the crowd which had gathered and separate the two men. Brown took Belton away * * * Crowder followed after them * * but * * * slumped to the sidewalk just before he could reach Que Street."

February 23, 1956, Judge Letts entered the following order:

"The Court finds and certifies that the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. The motion is therefore denied."

March 12, 1956, Belton filed in the District Court a motion for leave to file notice of appeal, time having expired, and for leave to appeal in forma pauperis, apparently with reference to the court's order of February 23, 1956. March 19, 1956, Judge Letts endorsed the following thereon: "The Court finds and certifies that the motion is without merit. The motion is therefore denied." April 5, 1956, Belton filed in this court a motion for leave to proceed on appeal in forma pauperis from the orders of the District Court of February 23 and March 19, 1956. He alleged that since the trial he had located an eyewitness, James Le Grand, who would corroborate the testimony of Wallace Brown in tending to show self-defense; that the Government knew where he was at all times during the five-year interval from August 2, 1949, the date of the crime, to September, 1954; and that the District Court denied his § 2255 motion without granting an oral hearing. June 25, 1956, this court denied the petition, and also denied a motion for appointment of counsel, which had been filed by Belton on May 24, 1956.

July 10, 1956, Belton filed in the District Court what he denominated a "Motion for A Rehearing to set aside conviction and sentence, and Affidavit in support for Leave to Sub Peana all record and material Evidence and eye witnesses that was at the scene of the crime. Title 28, Sec. 2255 in Forma Pauperis." In it he complained again that the Government had failed to produce three eyewitnesses and repeated his assertion he had acted in self-defense. He also alleged *inter alia* that police and jail officials "planted" Wallace Brown, a witness for the Government, in his cell "to spy and gain his confidence," and that Brown was also placed with him in a court house "bull pen," where he "overheard conversation

between Petitioner and his counsel." The motion was denied August 8, 1956.

August 16, 1956, Belton filed in the District Court an affidavit in support of an application for leave to proceed on appeal without prepayment of costs but did not specify the order from which he desired to appeal. September 18, 1956, Judge Letts endorsed thereon the following: "Application for leave to proceed on appeal without prepayment of costs denied."

October 10, 1956, Belton filed in this court a petition for leave to prosecute an appeal in forma pauperis from the District Court's order of September 18, 1956. He recited among the questions presented the following:

"Did not the U. S. Attorney and the officials of the District Jail conspire together to obstruct justice by taken a inmate out of the Petitioner cell and placing the Government witness in the Petitioner cell to conspire on the Petitioner before trial."

Without acting directly on this petition, this court entered an order November 16, 1956, allowing Belton to proceed on appeal in forma pauperis, not from the order of September 18, 1956, but from the order entered August 8, 1956, which denied the § 2255 motion filed July 10, 1956. Thus, this court treated Belton's affidavit filed August 16, 1956, as equivalent to a notice of appeal from the order of August 8. Our panel limited the appeal to the issues: "(1) should the District Court have granted a hearing on petitioner's allegation that there was an intrusion by a government agent into the confidential conversations between petitioner and his counsel? and (2) was petitioner deprived of the right to a speedy trial?" and on November 20 we appointed counsel to represent petitioner on the limited appeal so granted.

In considering this phase of the case, it is necessary first to examine the propriety of our order of November 16, 1956; for, if it was improvidently entered, the two issues concerning which an appeal in forma pauperis was pur-portedly allowed are not properly before us and we cannot deal with them.

The statute provides in paragraph [5] that "The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." We have already noted that Belton's first motion under § 2255 was denied by Judge Letts September 21, 1955, and that the order of denial was not appealed. Other motions under the same section were filed and denied before July 10, 1956. Consequently, Belton's § 2255 motion filed that day was a "successive motion."

If the sentencing judge "entertains" a second or successive motion, the statutory provision just quoted will not support its denial and an appeal from the order of denial authorizes review of the merits. Taylor v. United States, 9 Cir., 1956, 238 F.2d 409. On the other hand, if the court does not "entertain" the motion, but disposes of it under the provisions of the statute quoted above, the only inquiry on appeal from the order of disposition is whether the motion was in fact "a second or successive motion for similar relief." If so, the order will be affirmed by the appellate court; if not, the motion will be remanded for a hearing unless the court finds that "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." Section 2255, par. [3].

The first question then is whether the sentencing court "entertained" the motion of July 10, 1956, which it disposed of by the order entered the following August 8. The Ninth Circuit's Taylor opinion does not define the word "entertain," but the Supreme Court, in Brown v. Allen, 1953, 344 U.S. 443, 461, 73 S.Ct. 397, 409, 97 L.Ed. 469, defined the word as used in 28 U.S.C. § 2244, where its significance is the same as in § 2255:

"The word 'entertain' presents difficulties. Its meaning may vary according to its surroundings. In * * * § 2244 we think it means a federal district court's conclusion,

after examination of the application with such accompanying papers as the court deems necessary, that a hearing on the merits legal or factual is proper. * * * Even after deciding to entertain the application, the District Court may determine later from the return or otherwise that the hearing is unnecessary."

I construe this as a holding that a decision to "entertain" means a conclusion that a hearing on the merits is proper; from which it follows that to "entertain" means to conduct a hearing on the merits.

Judge Letts did not conclude that a hearing on the merits of the motion of July 10, 1956, was proper; hence, he did not decide to entertain it. And, as he did not hold a hearing on the merits, he did not entertain the motion. Whether he erred in not doing so is the immediate question.

It is well established that the statute leaves the matter of entertaining a second or successive motion to the sound discretion of the trial judge. United States v. Brown, 7 Cir., 1953, 207 F.2d 310; Johnson v. United States, 5 Cir., 1954, 213 F.2d 492; Jackson v. United States, 4 Cir., 1955, 224 F.2d 556; Corcoran v. United States, 7 Cir., 1956, 231 F.2d 449. That is to say, although the judge may entertain a second or successive motion, he shall not be required to do so if it is for similar relief.

The motion of July 10, 1956, which Judge Letts refused to entertain, was of course a successive motion, as I have shown. Whether it was for "similar relief" within the meaning of paragraph [5] of § 2255 is therefore the decisive question; it presents some difficulty because the meaning of the words "similar relief" is not spelled out in the statute. The term implies that a second or successive motion may be for relief dissimilar to that sought in an earlier motion; that different kinds of relief are available under § 2255. And yet the only motion authorized by the section is one "to vacate, set aside or correct the sentence;"

that is the only relief available to the prisoner.

I observe that under paragraph [1] of § 2255 the motion may be made by a prisoner "claiming the right to be released upon the ground [a] that the sentence was imposed in violation of the Constitution or laws of the United States, or [b] that the court was without jurisdiction to impose such sentence, or [c] that the sentence was in excess of the maximum authorized by law, or [d] is otherwise subject to collateral attack * * *."

In order to attribute some meaning to the words "similar relief" in paragraph [5] of § 2255, I suggest the possibility that Congress intended that the sentencing court shall not be required to entertain a second or successive motion based on one of these four statutory grounds which had been invoked in a previous motion. Using that standard, I turn to examine the situation here. The two grounds of the motion of July 10, 1956, with respect to which the panel allowed this limited appeal, arise under the Constitution: denial of the effective assistance of counsel, and denial of a speedy trial. In his first motion, filed August 8, 1955, and again on October 17 of that year, Belton alleged he had not had the effective assistance of counsel and in the motion of November 17, 1955, he alleged he had been denied a speedy trial. These were attacks on the sentence as having been imposed in violation of the Constitution, and are exactly the same as the two grounds for the last motion with respect to which we allowed this appeal. Thus the last motion—July 10, 1956—was a successive motion for relief based on the alleged violation of the same constitutional rights which had been relied on in three previous motions. It was therefore for "similar relief" within the above postulated meaning of those words, and the sentencing court was not required to entertain it.

It is true, however, that the last motion alleged the witness, Wallace Brown, was "planted" in his places of confinement

"to spy and gain his confidence" and there "overheard conversation between Petitioner and his counsel." If this was inferentially an allegation that he was deprived of the effective assistance of counsel, the claim was based on a different ground than that alleged in the earlier motion, which was that his employed counsel was incompetent and "assisted the government, instead of his client."

It is also true that the earlier motion had claimed denial of a speedy trial during the years of fugitivity, while the question posed later included the period from March 2, 1954, when he was arrested, until September 8, 1954, when the trial began.

From these considerations it might be said that, although Belton's last motion rested on the same statutory ground which he had invoked in previous motions,[5] it was based on slightly different factual grounds. The next and only remaining question, then, is whether this undoubtedly successive motion was not one for "similar relief" because of the fact that it presented some factual grounds which had not been urged in previous motions. This question has not heretofore been considered by this court. Other courts which have considered it are divided.

There is some confusion in the cases which seems to have arisen from what I think is the mistaken notion that the remedy provided by § 2255 should be equated with habeas corpus and that the rule with respect to successive applications for that writ should be applied to successive applications under § 2255. That rule is that res judicata does not apply to applications for habeas corpus although, in considering a petition for the writ, the court may require a showing of the record and action on prior applications and may decline to examine further into the merits because they have already been decided against the petitioner. Darr v. Burford, 1950, 339 U.S.

200, 215, 70 S.Ct. 587, 94 L.Ed. 761. This avoidance of abuse of the writ is expressly authorized by 28 U.S.C. § 2244, which reads as follows:

> "No circuit or district judge shall be required to entertain an application for a writ of habeas corpus * * * if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus *and the petition presents no new ground not theretofore presented and determined,* and the judge or court is satisfied that the ends of justice will not be served by such inquiry." (Emphasis added.)

The italicized words show a deliberate legislative intent to preserve the long-established principle that res judicata does not apply to applications for habeas corpus. But the motion to vacate sentence provided for in § 2255 is not a mere substitute for habeas corpus. This section of the statute, as the Reviser's note says, "restates, clarifies and simplifies the procedure in the nature of the ancient writ of error coram nobis. It provides an expeditious remedy for correcting erroneous sentences without resort to habeas corpus."

The omission from § 2255 of the words I have italicized in § 2244, which is a part of the same statute, has pointed significance. If Congress intended that language with respect to habeas corpus, which it consciously and carefully inserted in § 2244, to apply as well to motions to vacate sentence under § 2255, it doubtless would have worded paragraph [5] thereof somewhat as follows: "The sentencing court shall not be required to entertain a second or successive motion for similar relief *on the same factual grounds.*" To hold, then, that this language: "if it appears that the * * * [successive] petition [for habeas corpus] presents no new ground not theretofore presented and determined," which was

---

5. "* * * [T]he ground that the sentence was imposed in violation of the Constitution or laws of the United States * * *." Par. [1] of § 2255.

carefully inserted in § 2244, applies equally to motions under § 2255, is to read into the latter section a provision which is not there and which Congress apparently intentionally omitted. There was no necessity for its inclusion. After the denial of a successive motion under § 2255, habeas corpus remains available to the prisoner, subject only to the limitation set forth in paragraph [7] of § 2255.

Turning to the authorities, I find three circuits have held that the sentencing court is not required to entertain a successive motion for similar relief even though it is based upon factual grounds not relied upon in the antecedent motion. In Lipscomb v. United States, 1955, 226 F.2d 812, 816, the Eighth Circuit, after referring to a previous unsuccessful motion by Lipscomb, said:

"* * * The same relief was sought in that motion as in the motion here under consideration and the contentions now presented could have been urged in that proceeding as there is no claim that they arose subsequent thereto and the decision in that proceeding is binding on the defendant not only as to the contentions there made but as to all other contentions which could have been made."

The United States Court of Appeals for the Sixth Circuit has expressed the same view. In Dunn v. United States, 1956, 234 F.2d 219, 221, that court said:

"Appellant's contention that his present motion is based on new grounds not included in his previous motion is without merit. In our opinion, the successive proceedings seek 'similar relief on behalf of the same prisoner,' and under the provisions of Section 2255, Title 28, U. S. Code, it is within the sound discretion of the District Judge whether a

second motion seeking similar relief should be entertained. Moss v. United States, 10 Cir., 177 F.2d 438; Shobe v. United States, 8 Cir., 220 F.2d 928, 929; United States v. Brown, 7 Cir., 207 F.2d 310; Bickford v. United States, 9 Cir., 206 F.2d 395."

In Johnson v. United States, 5 Cir., 1954, 213 F.2d 492, the appellant filed in the sentencing court a second motion based on grounds not relied upon in the first. The appellate court said, at page 494: "Whether or not the second motion to vacate the sentence should have been considered is a matter resting in the sound discretion of the district judge. * * * We find no abuse of discretion here." Thus in this case the Fifth Circuit agreed with the Sixth and Eighth Circuits that reliance upon different grounds does not require the sentencing court to entertain a second or successive motion under § 2255.

The authorities to the contrary rely principally upon Barrett v. Hunter and Rutledge v. Hunter, 180 F.2d 510 (1950). In those cases the United States Court of Appeals for the Tenth Circuit was considering appeals from orders denying applications for writs of habeas corpus and was not immediately concerned with successive motions to vacate sentences made under § 2255. The question was whether the trial judge had correctly relied upon paragraph [7] of § 2255 in refusing to issue writs of habeas corpus.[6] The Court of Appeals affirmed his action but, in the course of its opinion, discussed the provision of § 2255 that the sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner. I quote from the opinion, at page 515:

"* * * If the second or successive motion sets up new or dissimilar

---

6. Paragraph [7] of § 2255 is as follows: "An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motions pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention."

grounds for relief which are within the purview of the grounds enumerated in the third paragraph of § 2255, and the motion and the records and files in the case do not conclusively show that the prisoner is entitled to no relief, the court should ordinarily entertain such second or successive motion. So construed, the provision conforms with the rule in habeas corpus with respect to successive applications for the writ, laid down by the Supreme Court in Salinger v. Loisel, 265 U.S. 224, 230, 232, 44 S.Ct. 519, 521, 68 L.Ed. 989 * * * ."

This passage seems to have been *obiter dictum*. According it respect, nevertheless, as a deliberate expression of the court's view, I do not consider it authority for the proposition that the language of § 2244 concerning a "new ground not theretofore presented and determined" should be read into § 2255. The opinion does not say the trial judge *must* entertain a second or successive motion which sets up new or dissimilar [factual] grounds, but only that he "ordinarily should" exercise his discretion to entertain it. This is not in conflict with the provision of § 2255 that the trial judge "shall not be required" to entertain such a motion.

Illustrative of the confusion in the cases to which we have referred are Hallowell v. United States, 5 Cir., 1952, 197 F.2d 926, and Bistram v. United States, 8 Cir., Oct. 1956, 237 F.2d 243. In the Hallowell case the Fifth Circuit relied to some extent on Barrett v. Hunter, but its Johnson case referred to above (213 F. 2d 492), decided two years later, shows it does not endorse the *dictum* of Barrett v. Hunter insofar as it holds that the presentation of a new ground requires the court to entertain a successive motion under § 2255. In the Bistram case the Eighth Circuit followed Barrett v. Hunter and quoted therefrom with apparent approval. But the opinion, written by the same judge who had written the Lipscomb opinion less than a year

before, does not overrule the Lipscomb case and makes no reference to it.

I conclude on reason and on what I consider the better authority that § 2255 should be literally construed to mean what it unqualifiedly says: that the sentencing court shall not be required to entertain a second or successive motion for similar relief. It follows that this court cannot reverse and direct Judge Letts to do what the statute expressly says he shall not be required to do. It follows further that we improvidently allowed even a limited appeal from the order of August 8, 1956, and that the appeal should therefore be dismissed.

Were it otherwise, I should have no difficulty in disposing of the two issues presented by the limited appeal. The witness Wallace Brown, who is alleged to have been "planted" in Belton's cell, was not a Government agent, but merely a recalcitrant Government witness who testified substantially as did Belton himself. Moreover, it was not alleged that this fellow-prisoner informed the Government of any conversation between Belton and his counsel, and so deprived appellant of the latter's effective assistance. The suggestion that the appellant was not afforded a speedy trial is obviously without substance. His naive notion that he was deprived of a speedy trial because he was not apprehended and tried during his years of fugitivity must of course be rejected. And I have already noted that the five continuances which were granted after his apprehension, two of which were at his instance, were justified.

In sum, I think the majority err in considering the appeal from the conviction, and also err in their decision thereon. Long ago, a jury found Belton guilty of second degree murder, a verdict which was finally acquiesced in by him and should not now be disturbed. The majority should reach the question of the limited appeal from a § 2255 order which was actually allowed by a panel of this court, and should then dismiss the limited appeal as improvidently granted. The appellant has trifled with this court far too long.

BASTIAN, Circuit Judge, dissenting.

I am in complete accord with all that is said by my brother Miller in his dissenting opinion. Because of the importance of the questions involved, I am constrained to make my additional comments as I am unable to agree with the conclusion or the reasoning of the majority in this case. A look at the record will disclose that Belton had a fair trial and, in my opinion, the judgment of conviction should be affirmed. While I duplicate some of the facts included in Judge Miller's dissent, I make this duplication for continuity in reading and to emphasize what I consider to be the error of the majority.

### The Nature of the Case Before This Court

Lewis Crowder died as the result of knife wounds inflicted by Belton in August 1949. Further details of the crime appear *infra*, in the subdivision entitled "The Merits."

In September 1949 Belton was indicted for second degree murder. He fled the jurisdiction, went to Virginia, changed his name and, although diligent search was made for him (by the police and the Federal Bureau of Investigation, among others), he was not apprehended until March 1954. Thereupon, he was quite promptly brought to trial and convicted of the charge for which he was indicted. The verdict of the jury was returned on September 10, 1954, and motion for new trial was denied on October 1, 1954, after which appellant was sentenced. In denying the motion for new trial, the experienced and able trial judge said:

"The Court thinks the matters that have been discussed were inherent in the duty of the jury and the jury has spoken. The Court sees no reason for doubting the correctness of the finding of that jury. The motion will be denied. Let the defendant step up, please."

On September 14, 1954, after the jury verdict but before sentence, appellant addressed a letter to the clerk of the District Court asking that he be granted the privilege of an appeal and asking to proceed *in forma pauperis*. Treating that letter as a motion to that end, Judge Letts, on September 18, 1954, entered the following order:

"Treating the above letter as a Motion for Leave to proceed on appeal without prepayment of costs the court finds and certifies that the appeal is not taken in good faith, the Motion is therefore denied."

At this time Belton was represented by able counsel of his own choosing, who, on September 16, 1954, had filed a motion for new trial; who, on October 1, 1954 (after denial of the motion for leave to appeal *in forma pauperis*), argued the motion for new trial; and who was present at the time of sentence and asked leniency for Belton. His retained counsel declined to proceed with the appeal.

On August 8, 1955, nearly a year after he had been sentenced, Belton filed in the District Court "Motion to Vacate Sentence and Release Defendant from Unlawful Custody, Trial; Judgment; Sentence; and Commitment, Null and Void, and No Effect in Law." This motion, which contained an argument against his conviction, also contained a statement that he should have been given not less than two competent lawyers to defend him and that the lawyer assigned to him was incompetent. On September 21, 1955, the judge who had tried the case entered the following order:

"The Court finds and certifies that the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. The motion is therefore denied."

On October 17, 1955, Belton filed in the District Court "Motion to Vacate and Set-Aside Sentence, and Affidavit for Leave to Prosecute in Forma Pauperis to Support Thereof," as to which motion the court entered the following order:

"The Court finds and certifies that the Motion and the files and records conclusively show that the prisoner

is entitled to no relief. The Motion is therefore denied."

On October 29, 1955, a similar motion was filed in the District Court, as to which the court, on November 8, 1955, entered the following order: "Motion denied."

Thereupon, on December 19, 1955, Belton applied to this court for leave to appeal from the order of Judge Letts of November 8, 1955, and for appointment of counsel. This motion was denied on January 26, 1956 (Misc. 604 in this court). Obviously, at this time at least, he knew of his right to apply to this court for leave to appeal *in forma pauperis* after denial of rights by the District Court, and to apply to have counsel appointed. Yet, as will be seen, even then he made no attempt to appeal from Judge Letts' order of September 18, 1954, or from the conviction and sentence. The record also discloses that appellant desired his retained counsel to appeal the conviction but that counsel advised that, as Belton had no money, he would not represent him on appeal and that Belton would have to retain other counsel.

On February 20, 1956, Belton filed in the District Court "Motion to Vacate and Set Aside Sentence as Provided by Title 28, Section 2255, Affidavit in Support of Application for Leave to Proceed Without Prepayment of Costs," as to which, on February 23, 1956, the court entered the following order:

"The Court finds and certifies that the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief. The motion is therefore denied."

Thereupon, on April 5, 1956, appellant filed in this court his petition for leave to appeal *in forma pauperis* from the order of February 23, 1956. After the Government filed its opposition thereto, appellant filed motion for appointment of counsel. On June 25, 1956, his motions were denied. (Misc. 649 in this court.) On July 10, 1956, a motion for rehearing was filed by appellant in the District Court, as to which, on August 8,

1956, the court entered the following order:

"The Court finds the motion to be without merit. It is therefore denied."

From this order appellant filed in this court a motion to appeal *in forma pauperis*. On November 16, 1956, this court entered the following order:

"ORDERED by the Court that petitioner be, and he is hereby, allowed to proceed on appeal in forma pauperis from the order of the District Court entered herein August 8, 1956, said appeal to be limited to the issues (1) should the District Court have granted a hearing on petitioner's allegation that there was an intrusion by a government agent into the confidential conversations between petitioner and his counsel? and (2) was petitioner deprived of the right to a speedy trial?

"It appearing to the Court that this appeal is not frivolous but presents a substantial question it is FURTHER ORDERED by the Court that the stenographic transcript of proceedings at the trial be prepared at the expense of the United States.

"It is FURTHER ORDERED by the Court that the record on appeal shall be prepared by the Clerk of the District Court as promptly as possible and shall be transmitted by him to this Court within 40 days."

The court, on November 20, 1956, appointed Mr. Arness to represent petitioner on this appeal.

Like the five motions in the District Court, the three petitions to this court— and the addenda thereto—were well documented with authorities and arguments.

Each of these motions was accompanied by a complete statement of points and authorities in favor of the motion, citing cases which, it was claimed, supported the several contentions. Never once, after the motion of September 14, 1954, above referred to, was any effort made to appeal from his conviction until May 2, 1957. On that date (two years and six

months after his sentence) appellant filed a motion to enlarge the scope of appeal.[1] Never once did he attempt, either before the District Court or here, a direct appeal to this court after the judgment of sentence. At the time the record on appeal was filed, presumably on the last motion, about three years had elapsed since the time of the notification of appeal.

### Was There Excusable Neglect?

I am unable to tell from the several opinions and concurrences filed whether a majority of this court feels that the direct appeal is properly here by reason of "excusable neglect." I am not sure that a majority so hold; but, at any rate, I feel impelled to register my emphatic objection to such a contention.

As has been stated, and as will hereafter appear, appellant from some source has been receiving legal advice. The papers filed indicate knowledge of Supreme Court and lower court decisions and, while they are not, to my mind at least, persuasive, they do indicate legal "know how." But even these arguments (prior at least to the time of the enlargement of the scope of appeal) made by appellant do not go so far as to attempt to justify "excusable neglect." There *was* no excusable neglect.

It requires no citation of authority to reach the conclusion that the time limit in which to file notice of appeal and to perfect the appeal is jurisdictional. The rules of court, by which right to appeal is granted, have for their purpose early termination of criminal cases, for the benefit of both the accused and the public. Witnesses, for defense and prosecution alike, may be lost; memories may be impaired—so that justice to the accused and to the public may be thwarted. This doctrine of the jurisdictional aspect of appeal applies in *in forma* cases in this court as well as in notices of appeal in the District Court. See Kirksey v. United States, 1954, 94 U.S.App.D.C. 393, 219 F.2d 499. So far as I can see, there has not been presented the slightest excuse for neglect running over a period of two and a half years, when the District Court and this court have been bombarded with all sorts of legal motions and arguments during that time. In his opinion Judge Fahy states:

> "[I]t is not permissible for us to hold that uncounseled and imprisoned appellant should have known in the fall of 1954 what we only now decide, and, in addition, should have known that the rules required him to perfect within forty days from September 14, 1954, an appeal which we cannot say he even knew he had."

I emphasize the fact that, even were there force to this statement, which I think there is not, certainly appellant knew as early as December 19, 1955, when he filed in this court motion for leave to appeal from the order of Judge Letts of November 8, 1955, that he could apply to this court; yet no action was taken to obtain a direct appeal until counsel, on May 2, 1957, filed motion for leave to enlarge the scope of appeal (see note 1, supra). Appellant had from September 18, 1954, to October 1, 1954 (when his retained lawyer withdrew) to obtain legal advice; and at least from August 8, 1955, when the first of his series of motions under § 2255 was filed, to obtain advice from whoever it was assisting him in his legal papers.

### Does Christoffel v. United States Give This Court Jurisdiction Over the Direct Appeal?

A majority of this court has apparently ruled that under the case of Christoffel v. United States, 1950, 88 U.S.App.D.C. 1, 190 F.2d 585, we have the inherent right to examine the case on a direct appeal

---

1. The appeal here, until the scope of appeal was sought to be enlarged, was from the denial of the motion filed August 8, 1956, under 28 U.S.C. § 2255. This court, on June 3, 1957, directed that action on appellant's motion to enlarge be deferred until the hearing of the appeal, and the parties to the appeal were directed to include in their briefs the jurisdictional and substantive issues presented by the motion.

which was attempted to be perfected nearly three years after the sentence was imposed and after the granting of the right to appeal *in forma pauperis* in the § 2255 proceeding. In Christoffel the court did hold as proper the dispensatory discretion vested in courts of appeals under Rule 39(a), Fed.R.Crim.P., to consider questions on appeal notwithstanding noncompliance with the usual procedural requirements; but the court added that this discretion should be exercised sparingly. There the delay was not even one month; here it was nearly three years. In Christoffel there were facts justifying the use of this extraordinary relief. Here there is none.

In Christoffel appellant was represented by counsel at all times. After sentence, notice of appeal was filed and counsel obtained two extensions of time to file his record on appeal. Thereafter a third extension was applied for but it was denied because the time for obtaining an extension had expired and the District Court had lost jurisdiction. Within the next month counsel applied to this court for an extension of time to file the record on appeal pursuant to Rule 45(b) (2), Fed.R.Crim.P. This motion was denied for failure to make a showing of excusable neglect. On reconsideration of appellant's motions, Chief Judge Stephens said:

"* * * the rules fixing the time for the taking by the parties through their counsel of the procedural steps requisite in the prosecution and presentation of a cause are necessary for the orderly and equal administration of justice according to law and must be vigorously enforced. Therefore, the dispensatory discretion vested in the United States Courts of Appeals under Rule 39(a) *should be exercised sparingly*. We conclude, however, that in the instant case it should be exercised. There is nothing in the record to show that the appellant was personally neglectful of the appeal or that he had had, prior to their failure to file the record in time or within time to apply for an extension, any

reason to doubt that his counsel would give due attention to the appeal * * *. [A]lthough we are obliged to deny the motions for enlargement of time as made under Rule 45(b) (2) on account of alleged excusable neglect, finding the neglect not excusable, we shall, acting under Rule 39(a), on our own motion, modify the District Court's order of May 15 extending the time for filing the record to May 29 by extending the time to ten days after the date of this decision. * * *" 88 U.S.App. D.C. at page 10, 190 F.2d at page 594. [Emphasis supplied.]

Christoffel should not be extended to include the present case. Appellant's neglect was not excusable. After sentence, Belton was informed by his retained counsel that he would have to obtain other counsel to represent him on appeal.

Appellant was represented at his trial by experienced and retained counsel, who was still in the case after the denial of the *in forma* motion for leave to appeal. Appellant knew of his right to appeal from the beginning, as he asked the trial judge, on September 14, 1954, for leave to appeal *in forma pauperis*. After the denial of his counsel's motion for a new trial and after sentence, he remained content and silent for about a year. Certainly it may be said that appellant knew as early as December 19, 1955 (if he did not know before), when he filed in this court a motion for leave to appeal from the order of Judge Letts of November 8, 1955, that he could apply to this court, yet no action was taken until counsel filed on May 2, 1957, motion for leave to enlarge the scope of appeal. In Christoffel the non-compliance with the usual procedural requirements was less than one month, and appellant in that case was in no way responsible, nor did he have any knowledge of the delay. Here, Belton knew of his rights on appeal, and the delay was nearly three years after sentence was imposed.

I cannot conceive that, when Chief Judge Stephens wrote Christoffel, he ever

dreamed that his words would be construed to include such an extension as to allow an appeal to be perfected nearly three years after conviction, particularly as he clearly indicated that "Rule 39(a) should be exercised sparingly."

If the rule laid down in this case by the majority means anything, it is that all that a convicted criminal need do is to file a notice of appeal and lie back and wait; and, at any time thereafter, the court may, at its discretion, review the entire record of the trial. I cannot believe that Rule 39(a) supra, or Rule 73 (a), Fed.R.Civ.P., 28 U.S.C. should be so construed.

If there has been error in the trial, appeal should be taken within the time fixed by the rules so that, if the case is reversed, it can be retried promptly, while witnesses are available. It is inconceivable to me that the rule can be construed as allowing an indefinite time for appeal simply because a notice of appeal has been filed. If it can be construed to allow a three-year period, that period could be extended to any length of time whatsoever.

I believe that the case of Moore v. State of Michigan, referred to by Judge Fahy in his opinion, is inapplicable to this case. There the question involved was the alleged denial of a *constitutional right* under the due process clause of the Fourteenth Amendment. I cannot read it as authorizing the examination of the record of a trial years after it has been concluded, to ascertain whether questions—objected to and unanswered—should have been asked, and whether arguments of the prosecuting attorney—not objected to—constituted misconduct.

### The Merits

Assuming, however, that this court has the right to consider the appeal of the original case, to my mind the record discloses that appellant had an eminently fair trial and that all of his rights were protected. There is, in my judgment, no basis for reversal.

It is true, as the majority points out, that appellant was smaller than the decedent, and I am willing to accept the theory of the prize ring that a good big man is usually physically better than a good little man. However, when the little man has in his hand a knife, which he has been able to open despite such an improbable situation as Belton described, the disparity in size is more than compensated for.

The fact is that the record discloses a number of things pointing to the guilt of appellant, and certainly the twelve jurors and the very able trial judge reached this conclusion. The coroner testified that the decedent weighed 160 pounds, was 6 feet 3 inches in height; appellant lighter and smaller. The decedent sustained the following injuries: an incised or cut wound in the neck, which injured a large vessel in the neck, and ten wounds in the body. The records of the hospital to which he was taken after the cutting disclose that the decedent was admitted from the emergency operating room after having both internal and external jugular vein ligated after they were severed; that there were multiple lacerations, severed internal anterior jugular vein, left; laceration on the left arm and forearm; multiple deep lacerations on the head, neck and left arm; both internal and external jugular vein was sectioned on the left and sutured on the left; also a suture in the mouth, along with a cut in the flexor surface of the left forearm; superficial incisions on the forearm; a severed incision from the left crown of the mouth to the lobe of the ear; another small incision in the left ear; and a deep laceration at the base of the nose.

The evidence further shows that appellant was still "mad" when he was taken from the scene by the witness Brown; and, in appellant's statement to the police on his arrest, he said that the decedent had grabbed him by the shirt and started beating him in the face; that, when he was turned loose, the decedent started kicking him; and that he [appellant] got out his knife and started cutting the decedent. It further appears from appellant's own testimony that he was not being held

by Crowder at the time of the cutting and was not, therefore, acting in self-defense. On being asked how he got the knife out and how he opened it, he stated that he did not know. It is significant that if he were being held or kept from retreating he would have had difficulty in opening the knife as, certainly, that would have required one hand, and in all probability two. He could not describe the knife, which he had carried for some eight months prior to the killing and which he disposed of after the cutting. There is no evidence whatsoever that Crowder, the decedent, was armed; and the fact that he was not stationary during the cutting would seem to establish that he was attempting to escape the knife which was being used by appellant with such devastating effect.

The vicious injuries above described, together with the actions of appellant in leaving the District of Columbia after the crime and remaining away under an assumed name until he was caught in 1954 (although search had diligently been made for him), are to be believed rather than appellant's story, which, to say the least, was most improbable. Appellant's credibility was attacked also when it was shown that he had been previously convicted of assault with a dangerous weapon and, further, that he had been convicted of carrying a concealed weapon. His credibility as a witness was further impeached by the fact that he was also convicted of assault in 1951, *this while he was a fugitive from the police on the murder charge.*

The main ground given by the majority for reversal of this case on the merits is the alleged misconduct of the United States attorney in his examination of the witness Brown. I wave aside the fact that no objection was taken to this examination. Obviously, able counsel for appellant did not consider the matter any more improper than I do, nor did the trial judge.

As a matter of actual fact in this regard, appellant was better treated than under the law he was entitled to be, in connection with the examination of the witness, Wallace Brown, who had given to the Government a signed statement and who was the only eye-witness available to the Government. Brown, who was an inmate of Lorton at the same time as Belton, was brought to the courthouse along with Belton "quite a few times" and interviewed by the United States attorney in the cell block. At one of these interviews Brown stated that some of the things contained in his statement were true and some were not true, but he was not specific. The United States attorney did not know what parts of the statement Brown would testify to. Evidently Brown had had a change of mind for one reason or another.[2]

Brown was placed on the stand by the Government, as the Government had the right, and indeed the obligation, to do since Brown was an eye-witness to the murder. He was asked questions as to the contents of his statement. This was objected to by counsel for appellant. The Government pleaded surprise but, because the United States attorney had known of Brown's position before placing him on the stand, the court would not let him proceed to cross-examine. From time to time the Government attempted to bring out from Brown the facts concerning which he had made his statement. On each of these occasions, objections to *answering* of the questions were sustained by the court. No objection was made to *asking* of the questions, none of which was answered. Even if it were true that the Government could not claim surprise, it is perfectly obvious that there was on the stand a hostile witness and one who had gone back on his previously

---

2. The United States attorney advised the District Court that when he interviewed the witness in the cell block "[h]e started to talk to me about giving him a letter to the jail, about saying he is being here as a government witness, so he would get good time and working conditions, or something else like that." Evidently, the United States attorney would have none of this.

signed statement. I believe the rule is as laid down by Judge Learned Hand in the case of Di Carlo v. United States, 2 Cir., 1925, 6 F.2d 364. There one of the prosecution's witnesses had made a statement which incriminated one of the defendants. Called at the trial, this witness proved recalcitrant and would not stand by her story. The United States attorney then proceeded to cross-examine and brought out her contradictory statements. In his opinion, Judge Hand stated:

"The prosecution, plainly surprised by this volteface, then began to cross-examine her straitly, and brought out from her contradictory statements, made not only before the grand jury, but on other occasions. Her actual evidence before the grand jury was not introduced. The latitude to be allowed in the examination of a witness, who has been called and proves recalcitrant, is wholly within the discretion of the trial judge. Nothing is more unfair than to confine a party under such circumstances to neutral questions. Not only may the questions extend to cross-examination, but, if necessary to bring out the truth, it is entirely proper to inquire of such a witness whether he has not made contradictory statements at other times. He is present before the jury, and they may gather the truth from his whole conduct and bearing, even if it be in respect of contradictory answers he may have made at other times.

"In St. Clair v. U. S., 154 U.S. 134, 14 S.Ct. 1002, 38 L.Ed. 936, this procedure was approved, as also in Swift v. Short, 92 F. 567, 34 C.C.A. 545 (C.C.A. 8); Hays v. Tacoma R. & P. Co. (C.C.) 106 F. 48; Tacoma v. Hays, 110 F. 497, 49 C.C.A. 115 (C.C.A. 9). See, also, Hickory v. U. S., 151 U.S. 303, 309, 14 S.Ct. 334, 38 L.Ed. 170. The question decided in Putnam v. U. S., 162 U.S. 687, 16 S.Ct. 923, 40 L.Ed. 1118, did not arise here. Nor was the right abused as in Rosenthal v. U. S., 248 F. 684, 160 C.C.A. 584 (C.C.A. 8). The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury see of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court. There is no mythical necessity that the case must be decided only in accordance with the truth of words uttered under oath in court.

\*   \*   \*   \*   \*   \*

" \* \* \* He [the United States attorney] is an advocate, and it is entirely proper for him as earnestly as he can to persuade the jury of the truth of his side, of which he ought to be thoroughly convinced before he begins at all. To shear him of all oratorical emphasis, while leaving wide latitude to the defendant, is to load the scales of justice; it is to deny what has always been an accepted incident of jury trials, except in those jurisdictions where any serious execution of the criminal law has yielded to a ghostly phantom of the innocent man falsely convicted." Id. 6 F.2d at pages 367–368.

In the case of Meeks v. United States, 9 Cir., 1950, 179 F.2d 319, 321, a first degree murder case, the court quoted with approval language appearing at 58 Am.Jur., Witnesses § 795, page 441:

"The prosecution in a criminal case may impeach a witness whom it is under a legal duty or obligation to call, such as an available witness to the crime \* \* \*."

It seems clear, in the instant case, that it was the duty of the Government to call the witness Brown and that the Government had the right to impeach him. The court, in the Meeks case, continued:

"Hartness, the witness whom appellant asserts the Government impeached, was its principal witness

without whose testimony premeditation could not have been established. Hartness was also a witness before the grand jury. There is no doubt he fell within the category of witnesses whom the prosecution was under an obligation and duty to call. State v. Slack, 69 Vt. 486, 38 A. 311; People v. Elco, 131 Mich. 519, 91 N.W. 755, 94 N.W. 1069. Appellant relies on the case of People v. Vertrees, 169 Cal. 404, 146 P. 890. The exception to the rule against a party impeaching his own witness was not discussed in that case, doubtless because the witness whose testimony was impeached was not of sufficient importance *to impose a duty upon the prosecution to call him.*" 179 F.2d at page 321. [Emphasis supplied.]

Here, as there, appellant was, in my opinion, not prejudiced by the examination. See *infra.*

It is true in this case that the Government was face to face with the fact that Brown was going to deny part of the statement he had made but the United States attorney did not know which part, and he had a right, I think, to rely on a statement which had been voluntarily made in advance of trial. While Brown had indicated that certain of the material contained in the statement would be denied by him, the United States attorney had no way of knowing that, when Brown was placed under oath, he would deny any part of the statement or what part, if any, he would deny. As has been seen, the Government was bound to call him.

The trial judge would have been justified in allowing answers to the questions which were propounded to Brown but which were not allowed to be answered, and it is hard for me to understand how there could be error justifying reversal by the mere asking of the questions which

were excluded by the court.[3] In its charge, the court made it perfectly plain that only the evidence adduced at the trial was admissible; and, certainly, counsel for appellant saw no objection to the mere asking of the questions, particularly as they were not allowed to be answered. Sitting as we do, as appellate judges, faced only with the printed record, our position is entirely different from the situation before the trial judge and jury.

Nor do I think improper, under the circumstances of this case, the argument of Government counsel (which is part of the basis for ordering the new trial) concerning the statement as to witnesses being more available at the time the murder was committed than they would be some years later. The full statement used as part of the claimed misconduct of Government counsel is as follows:

"So, as I say, when this defendant fled the jurisdiction to avoid prosecution, you can infer that is a consciousness of guilt, that if he did stand trial in August, 1949, the Government would have sufficient evidence to convict him of these charges."

What the Government was saying was simply that flight was properly to be considered by the jury, and, as buttressing that, that, as every criminal lawyer knows, "nothing cures a criminal case like the element of time." As a matter of fact, appellant's own counsel began his argument to the jury by saying:

"The Government chose to go forward with this case without these witnesses. [Witnesses whose statements had been taken but who were not available at the time of the trial.] They announced ready. I think it is only fair to say that if the Government * * * had represented to the court that they didn't have certain witnesses and they

---

3. As a matter of fact, I believe the learned trial judge would have been justified in calling Brown as a court witness; but the court refused to do this, although requested so to do, because the Government had called Brown first. This indicates the care exhibited by the trial judge in protecting the rights of appellant.

834

wanted more time * * * that a continuance would have been granted."

Further, appellant's counsel said:

"Now, we have testimony that there were about 15 witnesses to this fight. But the Police Department, the Homicide Squad, the detectives interviewed four people. Now, they may have interviewed others, but they said all they can find out of all these people who apparently saw this fight was four of them, and that one of the four gave them a fictitious address, which left three. Then, when the case is about to come up for trial, they say they cannot locate two of the witnesses, and they proceed with only one witness."

In responding to this the Government used the words the majority also deem objectionable.

"Now, naturally we can't hold this man in jail forever until we locate the witnesses. The case happened in 1949. It has got to come to trial somewhere and some time. So surely I have shown, I believe, from the testimony of the officers in this case that the Government, as far as it is concerned, made diligent search for these witnesses, and naturally we have got to give this defendant a speedy trial or a reasonable trial. We cannot let him rot over there in the jail because the process of the law says he is entitled to a quick trial, or at least a reasonable time after his arrest. So what are we going to do? We have made a diligent search for these people, and naturally we do the best we can. We use the only tools that are left to us, and is that the Government's fault?

"Is the delay in this case the Government's fault? No. The delay is because the defendant has fled the jurisdiction. That is the reason why, and that is the reason why, ladies and gentlemen of the jury, those witnesses are not here, because of the lapse of time between 1949 and 1954."

The Government, in my opinion, used entirely proper argument in controverting that of appellant; and I see no reason to characterize Government counsel's argument as improper. I personally think it was entirely proper. I think the remarks of Judge Hand concerning the United States attorney in Di Carlo, supra, entirely appropriate in this case. Certainly it is true that the Government was not as able to produce witnesses five years after the commission of the crime (when witnesses are scattered and memories become vague or subject to influence) as it would have been had Belton not absconded. But even assuming that the remark should not have been made, this would not be ground for reversal, as the remark was not objected to by trial counsel. I call attention once again to the fact that, except in an extraordinary situation, we should not reverse because of a supposed error unless the trial court is, by objection, given an opportunity to correct the error. A defendant may not sit back, taking his chance on acquittal, with his eye on the appellate court. When error is claimed where no objection has been made, we should not let it form the basis for reversal of a case unless it was of sufficient importance to demonstrate that the rights of the defendant were adversely affected. Such is not the case here, in my opinion.

I have read every word of the record in this case and I can reach no conclusion other than that the appellant had a fair trial, that he was represented by competent counsel of his own choosing, and that his rights were in every way protected by the able and experienced trial judge and that, as stated by that judge, "there is no reason for doubting the finding of that jury." The trial judge was even more considerate of the rights of appellant than he need have been. See cases above cited.

*Proceeding Under 28 U.S.C. § 2255*

The disposition of this case by the majority of the court made it unneces-

sary for them to write on the validity of the claims forming the basis of the appeal allowed November 16, 1956, under 28 U.S.C. § 2255. Judge Miller has, however, written ably on this subject and has performed a real service by reviewing the authorities on the questions urged by appellant. I concur wholeheartedly in what he has written and in his conclusion that there is no merit in appellant's contentions urged under § 2255.

I think the judgment of conviction should be affirmed.

I am privileged to state that Circuit Judge Wilbur K. Miller concurs in this dissent.