**John T. DELBRIDGE, Appellant,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 14622.**

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 4, 1958.

Decided Dec. 11, 1958.

Mr. John A. Rafter, Washington, D. C., with whom Mr. Thomas H. Wall, Washington, D. C., (both appointed by this court) was on the brief, for appellant.

Mr. Nathan J. Paulson, Asst. U. S. Atty., with whom Mr. Oliver Gasch, U. S. Atty., and Mr. Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before PRETTYMAN, Chief Judge, and EDGERTON and DANAHER, Circuit Judges.

PRETTYMAN, Chief Judge.

Appellant Delbridge was indicted, tried and convicted for entering a store belonging to a partnership of two named persons and stealing $1,125.66. He had been employed at the store, and after the night of the crime he disappeared from the Washington area. Some three years later he told a sheriff in California that he believed he was wanted in the District of Columbia for the theft of $1,175 from the named store.[1] The difference between the actual amount of the theft ($1,125.66) and the amount Delbridge mentioned to the sheriff ($1,175) is critical.

Upon his trial Delbridge testified that on the night of the crime he passed the store, saw the door open and lights on, went in to investigate, saw the disarray, was frightened because he had a record and was on parole, and so left town that night—"I mean, I didn't fool around." He testified: " * * * and the next day I bought a paper in Raleigh, North Carolina, and it had a short piece in there about the door being open, and that is how come I know it stated that somebody had entered the store that night with a key, apparently with a key, and that the total sum of $1,175 was missing. And that is all it said."

The prosecutor ridiculed the story. Delbridge knew the amount of the theft, he argued, for one reason and one reason only—he (Delbridge) was the thief. As to the alleged newspaper article, the prosecutor told the jury:

"In any event, Mr. Delbridge tells you he read some account of this alleged theft in the newspaper. I put it to you, members of the jury, would the newspapers have reported $1,175 if the actual theft was $1,125.66? I submit to you, members of the jury, there was no such account in the paper. It would be of no import whatsoever for the newspapers in Roanoke, Virginia, or some town in Virginia that this defendant to report some small theft from some poultry company in the District of Columbia. [Sic.] You know when that is done just as well as I do. It is reported in some local newspaper when whatever the event may be concerns some local personage: then it becomes news. Barring that, of what possible interest could the people in some town in Virginia have of the fact that there was a theft committed from the College Hill Poultry Company here in the District of Columbia? I submit to you, none, and there never was such an account in any Virginia newspaper."

The trial was on May 3, 1955. On May 9th, six days later, counsel for Delbridge was back in court with a motion for a new trial, upon the ground that he had ascertained at the Library of Congress that there actually had been an article in the Washington Post on April 13, 1952, stating that $1,175 had been stolen from the named store. The supplemental record now before us shows that the article in the Post did name the store, gave the amount as $1,175, and did say the entrance was apparently effected by use of a key. A somewhat similar article appeared in the Star.

So the record presently before us poses two questions: (1) Why should Delbridge have told the California sheriff

---

I. The sheriff also testified that Delbridge said he stole the $1,175.

the amount of the theft was $1,175? The newspaper article said $1,175, but the thief would probably have known it was $1,125.66. (2) How did Delbridge know on May 3rd, before his counsel had located the item at the Library of Congress, that the newspaper article said entrance was apparently effected with a key? It did say that, and, as Delbridge put it on the witness stand, "that is all it said."

■ It seems to us that Delbridge is entitled to have a jury evaluate his credibility in light of the fact that there was a newspaper article which said just what he said it said. We can take judicial notice of the fact that the Sunday editions of Washington newspapers are sold as far away as Raleigh, North Carolina.

In argument here, something is made of the fact that Delbridge testified he bought the newspaper "the next day". The theft was discovered about 6:30 on the morning of April 12th, which was a Saturday. Delbridge testified he saw the door open, etc., at about 10:30 or 11 o'clock the night before, which would have been Friday, April 11th. He left Washington that night between 11:30 and midnight. He could not have been in Raleigh earlier than some time Saturday, the 12th. The articles in the Post and Star were in the Sunday editions, April 13th. It is argued to us that, when Delbridge testified he bought the newspaper "the next day", he lied, because the next day after the offense was Saturday, the 12th, and there was no article in the Saturday papers. But we think that is too fine a line upon which to rest a conviction. By "the next day" Delbridge may well have meant the day after he reached Raleigh, and the article was in the papers on that day.

■ We think the motion for a new trial should have been granted. Purely circumstantial evidence played a major part in this conviction. The judge knew the fulcrum role played by the story of the newspaper article, and he knew there was such a story and that it conformed to Delbridge's account of it.

Justice requires a trial in the light of those facts. It is urged that counsel for Delbridge should have known of the newspaper article at the time of trial and that therefore the article is not "newly discovered" within the rule as to new trials on that ground. Strictly speaking, that is true, but we think it is too much to require that under the circumstances counsel should have anticipated the key part to be played by the newspaper incident in the prosecutor's attack on Delbridge and thus should have searched the files of the Library of Congress upon such anticipation. The publication of the article was not an obvious or readily available fact, a technicality, or a point of law. We are impressed by the combination of circumstances: (1) This case was built largely upon circumstantial evidence; (2) Delbridge said there was a newspaper article naming $1,175 as the amount stolen and a key as the apparent mode of entrance; (3) the prosecutor relied heavily upon the improbability of the story; and (4) there was in fact such a newspaper article. Delbridge should have a new trial.

Reversed.

DANAHER, Circuit Judge (dissenting).

Delbridge told the California sheriff, according to the latter's testimony, he was tired of running from the charges. His "friends had informed him that there was a fugitive warrant for his arrest by the FBI." "He stated to me that he stole $1175 from the College Hill Poultry firm."

Delbridge testified he had been convicted of petty larceny under the name of Robert Jordan, of grand theft in California under the name of Thomas Delbridge, of violating the National Motor Vehicle Theft Act in Petersburg, Virginia, under the name of Tom Delbridge, and of auto stealing in Columbus, Ohio, under the name of John Delbridge. He checked in Hood River, Oregon, to see if there was a "flyer" outstanding against him.

Having been arrested at Bakersfield, California, on another charge, the marshal told him when his term was up, "We haven't got a thing in the world on you." *Then* he became "eager to go back and face the charges and clear it up." "If I wasn't wanted, I wanted it so I could go home to my people, and there was only one way I could find out \* \* \*."

Delbridge had a key to the store, but he testified that on the night of Friday, April 11, 1952, he found the door open, somewhere around 10:30 p. m. The front part of the store was closed and the night light was on. "So I went there and opened the door. I thought Joe [the manager] might possibly be down there working or something and I would go down and chat with him and see if I had anything to tell him, because I opened up every morning before Mr. Arthur came to work."

He went down into the basement and saw that the cubicle was wide open. As he looked about he noticed that the money box was open. All the lights were on. He then "got out of there as quick as I could," and left town within an hour, without his pay, and was a fugitive for three years.

Earlier that evening the manager had placed silver, some one dollar bills and a few fives in the cash box, available to make change the following day. He had concealed the rest of the fives, tens and twenties among some stacks of linen. He locked the door of the cubicle with a padlock and locked the store before leaving, he testified.

At 6:30 Saturday morning the manager again entered the store and went downstairs to get the money to be used in Saturday's business. The basement room door was closed. The lock had been broken and had been replaced over the hasp. Only when the manager reached to unlock the door did he discover that the place had been entered. Not only had the change box been emptied, but the linen had been pulled onto the floor, and large denomination

bills which he had there concealed were missing.

So the sequence establishes the manager concealing the money and locking the store. If Delbridge were not the next person to enter the basement locker, it was the thief. Then followed Delbridge who discovered the breaking, as he says. But "I left that door open," he testified. "I didn't touch anything down there, and I left the street door standing about half open." If those statements are true, someone else entered the same area after Delbridge left, placed the broken lock over the hasp and closed the store. This remarkable series of visits to the scene of the theft somehow strains credulity. The jury had to decide that either the manager lied or Delbridge did.

Then, when Delbridge said "I left town immediately that night, and the next day I bought a paper in Raleigh, North Carolina," he did not specify a paper published in Washington. The Washington Post, a morning paper, certainly "next day" could not have reported a burglary which was not discovered until 6:30 a. m. the "next day." Delbridge's attorney argued, contrary to the testimony, that "the defendant stated he read this in a Washington paper in Virginia."

The jury could have believed that the same "friends" who told Delbridge "that there was a fugitive warrant for his arrest by the FBI," as he stated to the California sheriff, also told him there had been a piece in the papers about the College Hill burglary where $1,175 had been stolen. The "friends" might have thought it more than coincidence that Delbridge disappeared when the money did. Advising him that a warrant was outstanding was barely short of clairvoyance, for he had not even been indicted until after his confession in Bakersfield. Moreover the news stories made no mention of Delbridge. Only when he thought, three years later, that the whole business had blown over and no charges were pending against him, do we find Delbridge "eager" to get back.

The newspaper episode which the majority say is "too fine a line upon which to rest a conviction" is a mere incident in the sum total of events. Delbridge simply presented "too fine a line" for the jury to accept. The District Judge who saw the witnesses and had an opportunity to appraise their worth was of similar mind. I would affirm.