**Anderson JONES, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**Misc. No. 1103.**

United States Court of Appeals District of Columbia Circuit.

April 30, 1959.

---

Mr. Philip A. Fleming, Washington, D. C. (appointed by this Court) was on the pleadings for petitioner.

Messrs. Oliver Gasch, U. S. Atty., Carl W. Belcher and Harry T. Alexander, Asst. U. S. Attys., were on the pleadings for respondent.

Before WILBUR K. MILLER, BAZELON and BURGER, Circuit Judges.

PER CURIAM.

It is ordered by the court that the order of this court entered in this case on March 9, 1959, denying the petition for leave to prosecute an appeal in forma pauperis is vacated.

It is further ordered by the court that petitioner is allowed to proceed on appeal from the judgment of conviction without prepayment of costs and that the joint appendix shall be printed at the expense of the United States.

Each judge reserves the right to file a statement of his position in this matter.

WILBUR K. MILLER, Circuit Judge, dissents.

Statement of Circuit Judge BAZELON: This case is before us on a petition for leave to prosecute in forma pauperis an appeal from a judgment of conviction under the narcotics laws, 26 U.S.C.A. § 4701 et seq.[1] On March 9, 1959, by an order from which I dissented, this court denied the petition. It was noted in the order that each judge reserved the right to file a statement of his position. Since then, by order of April 30, 1959, the court reversed itself and granted the petition, Circuit Judge Miller dissenting. I deem it advisable to state my reasons for voting to grant the petition.

We are required to grant the petition if the appeal presents a question which is not plainly frivolous. Ellis v. United States, 1958, 356 U.S. 674, 78 S.Ct. 974, 2 L.Ed.2d 1060. The Government opposes this petition on the ground that the question presented is plainly frivolous. The Government almost invariably opposes such petitions on this ground.[2] Ordinarily, however, we appoint counsel to file a memorandum in support of the petition, and we grant most of the peti-

1. A large majority of our criminal appeals are taken in forma pauperis. Of the 86 decisions on appeals from criminal convictions recorded in 101, 102 and 103 U.S.App.D.C. 61, 246 to 258 F.2d were cases in which this court or the District Court had appointed counsel to represent the appellant. Since we do not appoint counsel to represent an appellant able to pay the cost of his appeal, each of these appeals were prosecuted in forma pauperis. Of the remaining 25, seven were cases in which the appellant proceeded without prepayment of costs, albeit with retained counsel.

2. Frequently the contentions are not frivolous. See, for two striking recent examples, Williams v. United States, 105 U.S.App.D.C. ——, 263 F.2d 487; and Mullen v. United States, 105 U.S.App. D.C. ——, 263 F.2d 275. In both cases, the convictions were reversed without dissent (Williams on Jan. 29, 1959;

Mullen on Dec. 4, 1958). In each case, the substantial grounds for an appeal were set forth ably by the indigent's court-appointed counsel in a memorandum filed in support of the petition. The Government nevertheless characterized the proposed appeals as "frivolous." Such *pro forma* opposition, particularly in cases where transcripts have been prepared disclosing substantial questions for review, does not comport with the duty of the United States Attorney to assure that justice is done. Berger v. United State, 1935, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314.

I am pleased to note that in two recent criminal appeals the United States Attorney, on behalf of the Government, moved to reverse the judgment of the trial court and remand with directions to award a new trial. Young v. United States, No. 14793; and Lewis v. United States, No. 14916.

tions.[3] In a majority of these appeals in forma pauperis we affirm—as we do in most "paid" appeals.[4] But there are many meritorious appeals among them, and a substantial number result in reversals. If, because of the Supreme Court's Ellis decision, we are allowing more criminal appeals in forma pauperis, it is probable that these include a larger number of *meritorious* appeals.

From September 1, 1957, through February 28, 1959, we decided 24 appeals in which we had granted leave to appeal in forma pauperis although the District Court had previously denied leave on the ground that the appeal lacked merit.[5] *We reversed the convictions in 11 of these 24 cases.*[6] In 6 of the other cases

the convictions were affirmed by split decisions.[7] Thus in 17 of the 24 cases at least one judge of this court thought the conviction should be reversed. In all 17 of these cases, the Government had opposed the petitions for leave to appeal in forma pauperis.

A free society should be ready to assume the burden of infinitely more than 24 appeals to avert 11 miscarriages of justice. Concern for our docket should not attenuate the right of every indigent to point out, with the aid of counsel, what may prove to be errors. If time of bench and bar is spent in review of cases lacking in merit, it is the price we must pay for a system of justice that shields the poor man from "invidious discriminations."[8] We cannot review

3. Our Miscellaneous docket discloses that, beginning with Misc. 900 (filed in November 1957), 47 petitions for leave to prosecute direct appeals from convictions in forma pauperis were acted upon by this court. 31 were granted.

4. In 14 of the 18 prepaid appeals in which decisions are reported in 101, 102 and 103 U.S.App.D.C., 246 to 258 F.2d, the convictions were affirmed.

5. Thus grounds appearing "frivolous" to one judge may constitute reversible error in the eyes of another. This is sometimes the case even within divisions of our own court. For example, in Briscoe v. United States, 1957, 101 U.S.App.D.C. 318, 248 F.2d 640, the appellant was allowed to prosecute his appeal in forma pauperis, one judge dissenting. After the appeal was heard, the conviction was reversed in a 2–1 decision. 102 U.S.App.D.C. 145, 251 F.2d 386 (1958). In Lewis v. United States, No. 14916, D.C.Cir., decided March 16, 1959, this court, without dissent and upon the Government's motion, remanded the case with directions to award a new trial. But when the case had been before us on Lewis' petition for leave to appeal in forma pauperis (Misc. 1066), one judge had dissented from allowance of the appeal.

6. Williams v. United States, 105 U.S.App.D.C. ——, 263 F.2d 487; Delbridge v. United States, 104 U.S.App.D.C. 399, 262 F.2d 710; Mullen v. United States, 105 U.S.App.D.C. ——, 263 F.2d 275; Judd v. United States, No. 14482, D.C.Cir., judgment reversed by order of Nov. 6,

1958; Loveless v. United States, 1958, 104 U.S.App.D.C. 157, 260 F.2d 487; Hanna v. United States, 1958, 104 U.S.App.D.C. 205, 260 F.2d 723; Polisnik v. United States, 1958, 104 U.S.App.D.C. 136, 259 F.2d 951; Belton v. United States, 1958, 104 U.S.App.D.C. 81, 259 F.2d 811; Briscoe v. United States, 1958, 102 U.S.App.D.C. 145, 251 F.2d 386; Catlin v. United States, 1958, 102 U.S.App.D.C. 127, 251 F.2d 368; Williams v. United States, 1957, 102 U.S.App.D.C. 51, 250 F.2d 19.

7. Ellis v. United States, 105 U.S.App.D.C. ——, 264 F.2d 372; Brown v. United States, 105 U.S.App.D.C. ——, 264 F.2d 363 (conviction affirmed in 5–4 en banc decision); Porter v. United States, 1958, 103 U.S.App.D.C. 385, 258 F.2d 685; Bell v. United States, 1958, 102 U.S.App. D.C. 383, 254 F.2d 82; Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 254 F.2d 725 (conviction affirmed in 5–4 en banc decision); Accardo v. United States, 1957, 102 U.S.App.D.C. 4, 249 F.2d 519.

8. Griffin v. People of State of Illinois, 1956, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891. And see the dissenting opinion of Judge Edgerton in Cash v. United States, 104 U.S.App.D.C. 265, 275, 261 F.2d 731, 741, judgment vacated, 1958, 357 U.S. 219, 78 S.Ct. 1365, 2 L.Ed.2d 1361: "The United States can afford to let poor defendants take criminal appeals that the rich could take. It cannot afford to do otherwise. And the burden of prosecuting, defending, and deciding appeals, though it is greater, is not inordinately greater than the burden of prosecuting and deciding disputes * * * over the

the cases which prove to have merit without reviewing some which may not.

I do not minimize the heavy burdens which the bar is called upon to bear in representing indigent appellants in this court.[9] We hope that Congress will provide an adequate solution. Until it does, in predicting which appeals may prove valid, our concern for the worth and dignity of every individual dictates that we had best err on the side of indulgence.

The question for which review is being sought in the present case is whether, in testing the sufficiency of cause for an arrest based on an informer's report, the accused is entitled to know the informer's identity.

The record discloses the following: On March 6, 1958, Officer Ernst of the Metropolitan Police Department Narcotics Squad received a telephone call from a confidential informant in New York City to the effect that petitioner had purchased narcotics in New York and was returning to Washington by train. The informer had supplied information in the past which the officer had found to be reliable. Officer Ernst, who did not know petitioner by sight, conveyed the information to Officer Somerville, who did know petitioner by sight. Officer Somerville met the train and, acting solely on the report conveyed to him by Officer Ernst,[10] arrested petitioner. He made an immediate search of petitioner's person and found certain narcotics in his pocket.

A pre-trial motion to suppress the evidence was denied. At the hearing of the motion, the prosecutor invoked the governmental privilege not to disclose the identity of the informer. The court sustained the privilege and defense counsel acquiesced in the ruling. At trial, defense counsel again raised the question of petitioner's right to disclosure of the informer's identity. The court ruled that the question was foreclosed by the earlier ruling sustaining the Government's privilege.

The narcotics were received in evidence at trial and provided the basis for petitioner's conviction on two counts for which he was given concurrent sentences of two to seven years, and seven years.

The exigencies of law enforcement require that a police officer be permitted to make an arrest when he has probable cause to believe a person guilty of a felony. Ordinarily he must present what he knows to a magistrate on an application for a warrant, so that the decision whether or not to arrest may be made as judiciously as possible. But, when circumstances preclude this judicious procedure, the police officer may make his own determination of probable cause, subject to later judicial testing. This represents a compromise with principle, based on the assumption, not always correct,[11] that when the objectivity of a magistrate cannot be brought to bear, a police officer sworn to uphold the law may be relied upon to act judiciously in abridging an individual's liberty. This compromise, which is dictated by necessity, transfers from the judicial officer to the police officer the delicate judicial function of determining, in the first instance, whether there is probable cause. The dangers are plain. They would be increased beyond limits tolerable in a free society if the law allowed the police officer to arrest solely on the basis of an informer's uncorroborated assertions. For this would give the *informer* the delicate function which the law generally reserves for the judicial officer and allows the police officer to exercise only in lim-

question whether an appeal should be made possible."

9. We made 108 appointments of counsel in criminal appeals during the calendar year 1958. 54 appointments have already been made in 1959.

10. "Q. [By the prosecutor] * * * Did you make your arrest based on that in-

formation given you by Detective Ernst? A. [By Officer Somerville] That is correct.

"Q. Did you have any other information concerning the Defendant, one way or the other? A. No, I did not."

11. See note 21 infra.

ited situations. The considerations which justify delegation of the judicial function to police officers do not justify a further delegation to their informants.

It is notorious that the narcotics informer is often himself involved in the narcotics traffic and is often paid for his information in cash, narcotics, immunity from prosecution, or lenient punishment. In Brandon v. United States, No. 14464, now pending before us, the informer was a narcotics user who was out on bail on another narcotics charge when she gave her information. Members of the very Narcotics Squad to which Officers Ernst and Somerville belong have in the past supplied drugs to an informer-addict who had difficulty obtaining supplies through normal illicit channels.[12] The so-called "special agent" or "special employee" of the Metropolitan Police Department who served as informer in Smith v. United States, 1958, 103 U.S. App.D.C. 48, 254 F.2d 751, was then under an indictment and had had numerous convictions including one for a narcotics

violation. He was paid no salary but received a fee for his information.[13]

The reliability of such persons is obviously suspect. The fact that their information may have produced convictions in the past does not justify taking their reports on faith. Like the roundly condemned ancient practice of approvement,[14] the present informer practice amounts to condoning felonies on condition that the confessed or suspected felon brings about the conviction of others. Under such stimulation it is to be expected that the informer will not infrequently reach for shadowy leads, or even seek to incriminate the innocent.[15] The practice of paying fees to the informer for the cases he makes may also be expected, from time to time, to induce him to lure non-users into the drug habit and then entrap them into law violations.[16]

For such reasons, the law has wisely circumscribed the use of informers' reports as a basis for making arrests. It has required a showing of reliability of the information [17] and some corrobora-

---

12. Senate Committee on the District of Columbia, Investigation of Crime and Law Enforcement in the District of Columbia, S.Rep. No. 1989, 82d Cong., 2d Sess. 15 (1952).

13. See Donnelly, Judicial Control of Informants, Spies, Stool Pigeons and Agent Provocateurs, 60 Yale L.J. 1091, 1093–94 (1951).

14. Under the system of approvement, an approver was one who, "[b]eing arraigned on a charge of treason, or felony * * * confessed his guilt and, in order to obtain a pardon, offered to appeal and convict other criminals called the appellees. If the appellees were found guilty the approver was pardoned. If the appellees were acquitted, the approver was hanged." Donnelly, supra note 4 at 1091. See Hale, Pleas of the Crown 226 (1778).

15. Some years ago in New York an investigation revealed that, of 150 vice cases based on the reports of one stool pigeon, 40 were admittedly framed. Hopkins, Our Lawless Police 105 (1931).

16. On March 4, 1959, Judge Weinfeld, in the Southern District of New York, ac-

quitted and accused narcotics violator after finding that a "special employee" of the Federal Narcotics Bureau, who was paid between $40 and $60 for each case he "made," had introduced the defendant to the drug habit and, when he became desperate for drugs, induced him, in return for a shot, to act as intermediary in a narcotics sale to a Bureau Agent. N.Y.Times, March 5, 1959, p. 53. The judge commented that the "special employee" was "utterly untrustworthy and undependable." N.Y.Daily News, March 5, 1959, p. 66. The only comment reported to have been made by the Narcotics Commissioner was "we've lost other cases before." Washington Post-Times Herald, March 5, 1959, p. B–3. And see Sherman v. United States, 1958, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed. 2d 848.

17. See, e. g., Draper v. United States, 1959, 358 U.S. 307, 312–313, 79 S.Ct. 329, 3 L.Ed.2d 327; Contee v. United States, 1954, 94 U.S.App.D.C. 297, 215 F.2d 324. Cf. United States v. Turner, D.C.D.Md.1954, 126 F.Supp. 349; United States v. Blich, D.C.D.Wyo.1930, 45 F.2d 627.

tion by facts within the arresting officer's own knowledge. Such corroboration may be obtained by placing the suspect under surveillance and observing whether his behavior—e.g., making contact with persons known to be in the trade, or surreptitious passing of a package—tends to support the informer's story.

How much personal knowledge the policeman must have before making the arrest cannot be determined for all cases. Since circumstances vary, the rule must be stated in terms of what is reasonably inferable from the particular circumstances by a prudent police officer.[18] In the present case, the informer had reported that petitioner would be getting off a train from New York with narcotics. That the officer had sufficient basis for making the arrest when he saw the petitioner get off the train is settled by the Supreme Court's recent decision in Draper v. United States, 1959, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. It would appear from Draper that when a reliable informer tells an officer that an individual has left town to buy narcotics and is returning by train at a certain time, the policeman's observation of his return is enough to justify an arrest without a warrant.

When deprivation of liberty by arrest is justified by a combination of an informer's report and a policeman's own observations, the less the policeman is required to observe, the more significant becomes the informer's report. Since observation of so commonplace an act as coming home by train is enough, in combination with the report of an informer, to justify an arrest, the only significant limitation of the informer's power to cause an arrest is the requirement of reliability. The requirement that the informer be reliable stands as the only effective legal safeguard against false denunciations by irresponsible individuals who may be motivated by self-interest, spite, or even paranoia. The only other safeguard which remains rests not on law but on the good will of the police officer.

To give vitality to the requirement of reliability the law requires, if no probable cause exists without the information from the informer, that his identity be divulged, so that his reliability may be subjected to meaningful judicial scrutiny rather than accepted on a policeman's word. Roviaro v. United States, 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. In holding in Roviaro that the Government's "informer privilege" must give way to the accused's need for disclosure, the Court was dealing with the problem in a context other than the legality of an arrest, but the principle clearly extends to this context. The Court said:

"Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way. * * * Most of the federal cases involving this limitation on the scope of the informer's privilege have arisen where the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause. In these cases the Government has been required to disclose the identity of the informant unless there was sufficient evidence apart from his confidential communication." Id., 353 U.S. at pages 60–61, 77 S.Ct. at page 628.[19]

It is easy to argue that the informer's reliability is established by the fact that the petitioner really did have narcotics in

---

18. See, Brinegar v. United States, 1949, 338 U.S. 160, 175–176, 69 S.Ct. 1302, 93 L.Ed. 1879; Draper v. United States, supra, note 8, at page 313 of 308 U.S., at page 338 of 79 S.Ct.

19. The Court cited with approval four cases explicitly or implicitly supporting its proposition: Scher v. United States, 1938, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151; United States v. Li Fat Tong, 2 Cir., 1945, 152 F.2d 650; Wilson v. United States, 3 Cir., 1932, 59 F.2d 390; United States v. Keown, D.C.W.D.Ky. 1937, 19 F.Supp. 639.

his pocket when he was arrested. But it is too well established for argument that the validity of an arrest cannot be proven by its fruits.[20] A police officer may not make an arrest on the basis of information supplied by an informer unless he has reason to believe that on a post-arrest judicial test the informer's report can be shown to have been reliable when the officer acted on it. This is not a technical rule designed to shield the relatively few persons who are ultimately charged with crime; it is designed for the protection of the many whom the police arrest but do not charge. There is reason to believe that for every illegal arrest that produces evidence leading to prosecution, there are many which produce nothing, so that no charges are made and the arrests never come to light.[21] The many innocent persons thus arrested have no effective recourse against anyone for the deprivation of their liberty.[22] The law recognizes that the only way to protect the innocent is by imposing safeguards which protect the guilty as well. Weeks v. United States, 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

Under the principle of Roviaro, the District Court could not properly determine that there was probable cause for petitioner's arrest without requiring disclosure of the identity of the informer whose report was claimed to constitute such cause. Nothing in Draper suggests that the Court has abandoned the Roviaro principle. Indeed the Court pointed out in Draper that the identity of the informer was disclosed. The treatment of the requirement of corroboration in Draper suggests that the Roviaro principle must be strictly enforced.

20. Byars v. United States, 1927, 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520, and cases cited therein.

21. For example, the victim of a recent robbery in the District of Columbia reported that it was perpetrated by three "stocky" young negroes. Ninety persons answering that description were arrested—67 of them were detained in headquarters overnight. None of the 90 was ever charged with the crime.

During an inquiry into the circumstances of this roundup, the Superintendent of Police stated that "large-scale interrogations" were not unusual, and he cited specifically a recent investigation involving four murders during the course of which 6,170 persons were detained by the police. Washington Daily News, Jan. 21, 1958, p. 5, col. 1; Washington Post-Times Herald, March 3, 1958, p. B–1; Washington Evening Star, March 3, 1958, p. B–1. And see Trilling v. United States, 1958, 104 U.S.App.D.C. 159, 167, 260 F.2d 677, 685 (concurring opinion).

Junius L. Allison, Field Director of the National Legal Aid and Defender Association, recently wrote:

"Let's look at the figures reported by the FBI in the Uniform Crime Reports from the various states. In 1956 there were 111,274 individuals taken into custody on suspicion. These were not in connection with any specific crime. In the same year, 264,601 were apprehended where there was suspicion of guilt of particular crime. All of these—375,875, were later released without charge." 42 J.Am.Jud.Soc. 113, 117 (1958).

And see "The Past Is Prologue," 38th Annual Report of the American Civil Liberties Union 84–85 (1958), discussing a private survey of Chicago police practices:

"The ACLU study, based on a sample 2,024 file cases selected at random from records of the Chicago Municipal Court in 1956, revealed that at least 20,000 persons were detained illegally 17 hours or more. Almost 2,000 of these defendants were held for two days or longer. And between 350 and 400 were held for at least three days 'without charge, without bail having been set, without any vestige of "due process of law" having been accorded them.'"

22. In Nueslein v. District of Columbia, 1940, 73 App.D.C. 85, 90 note 15, 115 F. 2d 690, 695 note 15, this Court pointed out that despite the great many cases wherein courts have held a search and seizure to be unreasonable, only one Federal case was found of an action for damages against the offending officer. In some part, at least, the reason for this may lie in the notorious fact that most of the victims belong to a segment of our society which lacks the necessary means and knowledge to bring such actions. This, of course, would also preclude them from invoking the freedom writ of habeas corpus.

At the very least, it seems to me, there is no basis for concluding that the issue here presented is plainly frivolous. Ellis v. United States, 1958, 356 U.S. 674, 78 S.Ct. 974, 2 L.Ed.2d 1060.