Thomas E. TRENT, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 15545.

United States Court of Appeals
District of Columbia Circuit.

Argued May 31, 1960.

Decided Oct. 20, 1960.

Petition for Rehearing En Banc Denied
Dec. 21, 1960.

Bazelon, J., dissented.

Mr. Arthur G. Lambert (appointed by
the District Court), Washington, D. C.,
with whom Mr. Richard A. Fitzgerald
(appointed by this court), Washington,
D. C., was on the brief, for appellant.

Mr. Donald S. Smith, Asst. U. S. Atty.,
with whom Messrs. Oliver Gasch, U. S.
Atty., and Carl W. Belcher, Asst. U. S.
Atty., were on the brief, for appellee.

Before BAZELON, BASTIAN and BURGER,
Circuit Judges.

BURGER, Circuit Judge.

After jury trial appellant was convict-
ed on all counts of a six count indictment
for violation of narcotics laws.[1]  He was
sentenced to imprisonment for periods
ranging from a minimum of 1 to a maxi-
mum of 5 years, sentences running con-
currently.  He was allowed to appeal at
government expense with court appoint-
ed counsel who have ably briefed and
argued all available points in this court.

1.  21 U.S.C.A. § 174;  26 U.S.C. §§ 4704(a), 4705(a) (1958).

The principal points urged here are: (a) the defense of entrapment, it being contended that the District Court should have directed a verdict of not guilty; (b) that the government was required to call as its witness an informant whose information led to police surveillance of appellant which, in turn, developed the evidence on which appellant's conviction rests.

The record discloses: (1) that appellant was known to the police as an addict; (2) that the arresting police officer had previously observed him engaged with others in the use of narcotics and narcotics paraphernalia; (3) that the appellant made sales of narcotics to the officer on two separate occasions. The dissent depicts the appellant as just another one of the "mere addicts" upon whom the "present narcotics statutes" have an "unfortunate impact." The record does not support the argument that this appellant is a "mere addict." Apart from any of the information which the officers had received or the testimony of government agents that appellant engaged in drug traffic, Delores Terry, a friend of appellant who had no connection with the government, testified that appellant had supplied drugs to her "frequently." She testified that this occurred when she lived with appellant in the summer of 1959 and her description of one episode with the "mere addict" is disclosed by the following excerpt from the record:

"Q. Did Trent buy drugs for you or supply you with drugs? A. He bought drugs for me.

"Q. Frequently? A. Yes.

"Q. Now, then, did you ever pay him for them? A. No, I just gave him some of the stuff, that's all.

\* \* \* \* \* \*

"Q. What kind of a habit did Trent have; do you know? A. Same kind I had.

"Q. What would that be? A. You mean what type of drugs he used?

"Q. Yes. A. Heroin.

\* \* \* \* \* \*

"Q. Were you ever in Trent's presence when he went out to obtain money to purchase drugs? A. Yes.

"Q. Would you describe any one incident, as to what happened? A. I went shoplifting with him to get some money.

"Q. How frequently did you do that? A. Several times.

"Q. Did Trent have employment while he lived with you? A. Not to my knowledge.

"Q. Where would he get his money from to supply his habit with, do you know? A. From me most of the time.

"Q. Mostly from you. Were you working? A. No.

"Q. Where did you get your money from? A. Shoplifting.

\* \* \* \* \* \*

"Q. In other words, he was the man you saw to get narcotics; is that right? A. He wasn't a dealer, if that is what you mean.

"Q. No, but I meant, you would give him money to get it; isn't that right? A. Yes."

In great specificity the testimony showed Trent not only to be supporting himself generally by this unfortunate girl's illicit earnings but also supporting his drug habit by procuring drugs for her and taking his "compensation" for that illegal brokerage in the form of part of the drugs so procured.

The courts have regularly condemned and penalized enforcement by true entrapment procedures. Such methods are universally proscribed. Sherman v. United States, 1958, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848; Sorrells v. United States, 1932, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413. But this case is a far cry from Sherman or Sorrells. It is well settled that "[a]rtifice and stratagem may be employed to catch those engaged in criminal enterprises." 287 U.S. at page 441, 53 S.Ct. at page

212. In discussing the rule as it applied to Sorrells the Court said:

"The act for which the defendant was prosecuted was instigated by the prohibition agent, * * * it was the creature of his purpose * * * defendant had no previous disposition to commit [the crime] but was an industrious, law-abiding citizen, and * * * otherwise innocent."

The distinction between the "innocent" and the "predisposed" was again emphasized in Sherman v. United States, supra:

"To determine whether entrapment has been established, a line must be drawn between a trap for the unwary *innocent* and a trap for the unwary criminal. * * *" (Emphasis added.) 356 U.S. at page 372, 78 S.Ct. at page 821.[2]

The distinction was also emphasized by Judge Washington in Guarro v. United States, 1956, 99 U.S.App.D.C. 97, 101, 237 F.2d 578, 582:

"There are many situations wherein use of police decoys is permissible, and perhaps a practical necessity. Drug peddlers are hard to catch if the undercover policeman may not make a purchase. And * * * it may lead to a conviction * * *."

No one can seriously challenge the proposition that the courts should not aid or even tolerate criminal prosecution for acts "which [the accused] otherwise would not have attempted." Such methods will tend to foster crime and ought not be employed on behalf of the government to bring about convictions. Such methods ought to be and often are condemned by trial courts as well as appellate courts. See United States v. Johnson, Crim.No. 434–60, D.D.C. Sept. 16, 1960. The disturbing factor is that such cases as Sherman or Johnson can occur at all. But this is plainly not such a case. The question here is whether it can reasonably be said on this record that Trent, who trafficked in narcotics on behalf of Delores Terry as well as with the undercover officer, meets the test of an "innocent person" lured by police into crimes "which [he] otherwise would not have attempted."

When the appellant here is "subjected to [the] 'appropriate and searching inquiry into his own conduct * * *' as bearing on his claim of innocence" (Sherman, 356 U.S. at page 373, 78 S.Ct. at page 821), his claim, as that of the dissent, that he was a "mere addict," who was "innocent" until lured into crime by government agents, simply falls apart. Appellant's predisposition to engage in narcotics trafficking was not, as in Sherman, remote in point of time by several years, but current and active as the undisputed testimony of Delores Terry discloses. It should not be overlooked that the whole of her testimony showed her to be friendly to appellant and hostile to the government, even though she was called as a government witness.

The issue of entrapment was properly submitted to the jury under appropriate instructions. This record does not show as a matter of law, as contended by appellant and by the dissent, that the police or any police informant "had convinced an otherwise unwilling person to commit a criminal act." Quite the contrary the evidence shows that appellant "was already predisposed to commit the act and exhibited only the natural hesitancy of one acquainted with the narcotics trade."

2. As pointed out by Mr. Justice Frankfurter in his Sherman concurrence, the *particular* sale to an officer or police agent is *always* one induced by the purchaser. To find whether the accused is "predisposed" to commit that kind of crime requires answering, on the basis of the whole record, whether the conduct of the accused has been such as to persuade reasonable men beyond doubt that the accused is indeed a person who would commit, whenever the opportunity should arise, crimes of the kind solicited * * *." by the police or their agent.

"This does not mean that the police may not act so as to detect those engaged in criminal conduct and ready and willing to commit further crimes should the occasion arise. Such indeed is their obligation." Sherman v. United States, 1958, 356 U.S. 369, 383, 78 S. Ct. 819, 826.

Sherman v. United States, supra; Sorrels v. United States, supra. On the first transaction with the police officer appellant received $6 for two capsules and kept two capsules for himself. This afforded a basis on which a jury could reasonably conclude that this transaction was in the same pattern of his transactions with the witness Delores Terry, where appellant's "profit" on the transaction was taken in the form of narcotics rather than cash. Moreover, the record shows that when first approached by the plainclothes officer appellant refused to sell to him because, according to the officer's testimony, "he [appellant] didn't know who I was. He didn't know whether I was a policeman or who." On a second approach the officer was told by appellant to "wait a while and I will talk to you." This sequence of events, appellant now argues, shows that he, an "innocent mind" was entrapped to do wrong. However, a jury could reasonably view this conduct not as showing innocence of criminal disposition, but as a manifestation of the caution and wariness of one seasoned and knowledgeable in the ways of the drug traffic, and suspicious lest his customer be a police officer or informant.

No doubt also a jury would, and reasonably so, be influenced by the whole pattern of appellant's activities and mode of life, his willingness to live off the illicit earnings of Delores Terry, his activity in procuring drugs for her and taking his "pay" in narcotics caps, his wary responses to the agent's efforts to buy. Perhaps, too, the jury may have taken into account the fact that while Agent Coursey was aware of Delores Terry's weaknesses and need for narcotics he never tried to induce her to get drugs for him.

At this posture of the case we are not free to reject what the jury accepted as true nor to accept as true Trent's testimony which the jury refused to believe. But the dissent elects to reject or ignore the testimony of Delores Terry and of Agent Coursey and to accept as true the contradictory and equivocal self serving suggestion of appellant that Dorothy Washington induced him to abandon his pure state and return to his drug habit.[3] The dissent seems to recognize that in Sherman the Supreme Court did *not* choose between conflicting witnesses or pass on credibility, but rather reached its conclusion "from the undisputed testimony of the prosecution's witnesses." 356 U.S. at page 373, 78 S.Ct. at page 821. But the dissent attempts to bridge this very great difference in the facts of Sherman and the facts here by drawing inferences in favor of Trent from the prosecution's failure to call Dorothy Washington as a witness; he would have us say that because the prosecution failed to call this witness we are *compelled* to reject the undisputed testimony of Delores Terry and of Agent Coursey and believe Trent.

Because defense counsel was free to argue the "missing witness" point and because *the jury* was free to draw inferences unfavorable to the prosecution, it does not follow that at this very late date we are under a compulsion, as the dissent seems to be, to believe appellant. Deaver v. United States, 81 U.S.App.D.C. 148, 155 F.2d 740, certiorari denied, 1946, 329 U.S. 766, 67 S.Ct. 121, 91 L.Ed. 659; United States v. Davis, 7 Cir., 1959, 262 F.2d 871; Ferrari v. United States, 9 Cir., 244 F.2d 132, certiorari denied, Darneille v. U. S., 1957, 355 U.S. 873, 78 S.Ct. 125, 2 L.Ed.2d 78; cf. Masciale v. United States, 1957, 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859. Indeed, we as an appellate court are not even free to accept his testimony, which the jury must be deemed to

---

3. "Q. Now how did she get you back on? A. She would give me the stuff. She would give me narcotics when we—she had them, and I just started venturing back into it."
Appellant's "slip-of-the-tongue" reference to "we," quickly amended to "she" may not have been without significance to the jury which listened to his testimony and saw his conduct on the stand, for they, unlike our dissenting colleague, did not believe a word he said.

have rejected. To accept Trent's testimony would require us to reject other credible testimony believed by the jury.

■ Assuming, arguendo, that the evidence warranted the missing witness instruction with respect to Dorothy Washington if the defense had requested it, (but cf. Richards v. United States, 1960, 107 U.S.App.D.C. 197, 275 F.2d 655; see also United States v. Jackson, 3 Cir., 1958, 257 F.2d 41; United States v. Beekman, 2 Cir., 1946, 155 F.2d 580) the failure to give it without a request is not "plain error" under Rule 52(b) Fed. R.Crim.P., 18 U.S.C.A. That instruction is but one of a multitude of evidentiary instructions; denying the instruction might be error had it been asked for, but it was not indispensable to a fair trial on this record. This is pointed up by the fact that it is often a carefully calculated defense tactic *not* to ask for such an instruction in a close case thus leaving the defense free to press upon the jury the prosecution's failure to call an alleged "missing witness." There having been no such instruction requested, failure to give it is not "plain error."

Some would perhaps think it would be more appropriate for courts to extend a modicum of judicial sympathy to Delores Terry and the other potential victims of Trent's varied procuring activities, rather than on Trent. For surely if he is set free as the dissent would have us do—with his conduct judicially vindicated as it will appear to him—there will be other Delores Terrys, whose earnings from shoplifting, prostitution or other crimes will be exploited by Trent.

Affirmed.

BAZELON, Circuit Judge (dissenting).

This case presents another example of the unfortunate impact of present narcotics statutes on mere addicts, see my concurring opinion in Hawkins v. United States, No. 15514, —— U.S.App.D.C. ——, —— F.2d ——; and once again raises very serious questions regarding the methods employed by the Federal Bureau of Narcotics in enforcing these statutes.[1]

Although the narcotics laws are, in Congress' own view, primarily designed to deter and punish professional narcotics traffickers who prey upon the weak and defenseless,[2] they wreak their stiff vengeance upon both these leeches and their victims. Congress recognized that "Drug addiction is * * * a symptom of a mental or psychiatric disorder * * *."[3] from which it would appear to follow that the answer to the problem of addiction lies in medical and rehabilitative treatment and not severe, mechanical prison sentences which frustrate rather than facilitate rehabilitation.[4] But until Con-

1. For other instances, see Sherman v. United States, 1958, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (discussed *infra*); and United States v. Silva, D.C. S.D.N.Y.1959, 180 F.Supp. 557, reported in N. Y. Times, March 5, 1959, p. 53, where Judge Weinfeld acquitted an accused narcotics violator upon a finding that a paid informer of the Bureau introduced the defendant to the drug habit and then turned him over to a Bureau agent who made the "illegal" sale (see my statement in Jones v. United States, 1959, 105 U.S.App.D.C. 326, 330 n. 16, 266 F.2d 924, 928 n. 16).

2. See H.R.Rep. No. 2388, 84th Cong., 2d Sess. 9, 54 (1956), quoted in my concurring opinion in Hawkins v. United States, No. 15514, —— U.S.App.D.C. ——, —— F.2d ——.

3. Id. at 54.

4. According to the Honorable James V. Bennett, Director of the Federal Bureau of Prisons:
"Prisons, both state and federal, in the years immediately ahead will be faced inevitably with the problems of narcotic offenders, addict and non-addict alike, who are weighed down by the hopelessness and the bitter futility of sentences which seemingly stretch into infinity. What can the institution offer the man serving 30, 50 or 80 years with no prospect for parole or hope of mitigation of his sentence?" ["A Prison Administrator Views Today's Narcotics Problem," 3/27–28/58, p. 11, Symposium on the History of Narcotic Drug Addiction Problems, National Institutes of Health, Bethesda, Maryland, quoted in Statement of Circuit Judge Henry W. Edgerton on Sentences in Narcotics Cases, District of Columbia

gress, in recognition of its own findings, sees fit to remedy the situation, the judicial machinery must grind out its sorry grist by convicting as traffickers, addicts whose possession of, or transactions with, narcotics bring them within the ambit of the narcotics control laws.

The cloth of judicial self-restraint, however, cannot be stretched to shield the conviction of a narcotics addict whose "tragic dependency upon drugs" was created by agents of the Government who then preyed upon this weakness to induce him to procure narcotics for fellow sufferers in need. That is this case. Accordingly, the conviction should be reversed.

The record shows that one John Coursey, after a two-year training course at the Pennsylvania Institute of Criminology, was commissioned as a Treasury narcotics agent on March 16, 1959. He was assigned to the New York field office and almost immediately thereafter detailed to the Washington field office. Under the direction of three other agents, he was assigned to work under-cover in a group of addicts centering around one Dorothy Washington, an under-cover "special employee" of the Narcotics Bureau.[5] Miss Washington, herself an addict, financed her "habit" by prostitution. Her special utility to Coursey lay in the fact that she operated a rooming-house which was used as a "pad"—a place where addicts would gather to take their shots of heroin in company—as well as a brothel.

Appellant first became addicted to drugs in 1954 when he was about 18 years old. He paid for the drugs he used by selling his clothes, by stealing from his grandmother, with whom he lived, and by shop-lifting. His shop-lifting led to petty larceny convictions in 1954 and 1958. In April of 1959, appellant was discharged from the District of Columbia General Hospital Rehabilitation Clinic where he had been committed as a "narcotics vagrant." D.C.Code § 33–416a (Supp. VIII 1960). According to his unchallenged testimony, he was at that time cured of his drug addiction. He obtained regular employment and lived with his grandmother.

It was at this stage of his life, when he had never peddled drugs and was no longer using them, that the agents of the Narcotics Bureau fixed their attention upon him and instituted a course of con-

Circuit Institute on Sentencing, p. 2, Feb. 1960.] Another portion of Judge Edgerton's statement is quoted in my concurring opinion in Hawkins v. United States, No. 15514, —— U.S.App.D.C. ——, —— F.2d ——.

5. "Special employee" is Agent Coursey's repeated description of Dorothy Washington's relationship to the Government. Miss Washington did not appear at the trial and the record does not disclose the mode of compensation. From assertions in other cases, it would appear that narcotics employees are compensated in various ways: (1) actual cash payments for each narcotics offender turned over to the Bureau for prosecution (See note 1 *supra* concerning the case from the Southern District of New York, reported in the N. Y. Times, March 5, 1959, p. 53. The special employee there was paid forty to sixty dollars for each case he "made" and had earned some $1,-200 for eighteen cases reported over a three-year period); (2) immunity from prosecution under the narcotics laws in return for continued cooperation in reporting other offenders (See trial transcript in Willis v. United States, —— U.S. App.D.C. ——, 285 F.2d 663, where the defendant testified he was offered immunity from prosecution for making sales to suspected offenders in the presence of a narcotics agent and was himself framed when he refused to continue this cooperation); (3) payment in narcotics (See Deutsch, The Trouble With Cops 98 (2d ed. 1955); and Senate Committee on the District of Columbia, Investigation of Crime and Law Enforcement in the District of Columbia, S.Rep.No.1989, 82d Cong., 2d Sess. 15 (1952)).

The use of informers in narcotics cases is well described and documented in J. Goldstein, Police Discretion Not To Invoke the Criminal Process: Low Visibility Decisions in the Administration of Justice, 69 Yale L.J. 543, 562–73 (1960). The author suggests there that the practice of trading information for immunity from prosecution may be illegal. Id. at 568.

duct culminating in his present conviction. In May of 1959 "special employee" Washington, who had been a friend of appellant's for years, began to give him drugs and to invite him to stay at her rooming-house. The circumstances of Trent's readdiction are detailed in the following uncontradicted testimony:

"Q. Now when you came out [of D. C. General] you were no longer an addict? A. No, sir.

"Q. And you went back to Narcotics in May or June? A. May.

"Q. And the narcotic was heroin? A. Yes, sir.

"Q. Who got you back on narcotics? A. Informer mentioned in this case. She kept telling me to come—

"Q. Who was it? A. Dorothy Washington.

"Q. Was she your girl friend? A. She had been a friend of mine for years.

"Q. Now how did she get you back on? A. *She would give me stuff*. She would give me narcotics when we—she had them, and I just started venturing back into it.

"Q. Were you living with her? A. She asked me to come and stay with her.

"Q. Did you? A. Yes.

"Q. Did you actually stay with her or— A. No. She asked me to come and stay. She had a room down in the basement that I could stay there if I would like." [Emphasis supplied.]

By June of 1959—one month later—he was again in the throes of addiction and was living rent-free in the basement of Miss Washington's house with another young woman addict, named Delores Terry, who supported her "habit" by prostitution. With the profits of her profession, she also helped to supply appellant with drugs. Appellant's other source of income was the fairly regular shoplifting expeditions which he undertook, sometimes with the help of Miss Washington.

Agent Coursey, who had been working for some time among the wretches centering about the special employee's "pad," met appellant shortly after his re-addiction. The special employee led appellant to believe that Coursey was her boy friend and Coursey conceded that "she may have" told appellant that "he [Coursey] was alright." Between them, the two under-cover agents began to urge appellant to procure drugs for them and, in a few weeks, the two transactions occurred from which this case arises. The first transaction consisted of appellant procuring four capsules of heroin at the standard price of $1.50 per capsule, with money supplied by Agent Coursey. He gave two of the capsules to the agent and retained two for himself. Appellant agreed to obtain these drugs only after Coursey's repeated pleas that he needed heroin for his sick girl friend.[6] In the second transaction, appellant, acting at Miss Washington's request, procured four capsules and delivered them to her but was paid by Agent Coursey. These are the two "sales" for which appellant was convicted as a drug peddler.

My brethren hold that the immediate circumstances of the two sales do not amount to entrapment as a matter of law. I do not reach that question. Finding that the Government, through its agents, lured appellant into his dependency on drugs, I would hold that the Government may not prosecute him for offenses that spring directly from his addiction.

In a case most similar to the one before us, the Supreme Court reversed a conviction because it found the defendant had, as a matter of law, been entrapped into selling narcotics to an undercover agent who preyed upon his sympathies as a fellow addict.[7] The Court explained

---

6. Trent testified that he thought this "girl friend" was Dorothy Washington.

7. Sherman v. United States, 1958, 356 U.S. 369, 78 S.Ct. 819.

The facts were that the defendant met a Government informer at a doctor's office while both were undergoing cures for addiction. Their accidental acquaint-

that "Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations."[8] I think it equally clear that Congress could not have intended that the narcotics laws be enforced by tempting weak-willed persons into *addiction,* and then convicting them for violations which would not have been committed but for such addiction. The Supreme Court said in Sherman:

> "The case at bar illustrates an evil which the defense of entrapment is designed to overcome. The government informer entices someone attempting to avoid narcotics not only into carrying out an illegal sale but also into returning to the habit of use. * * * Thus the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted. Law enforcement does not require methods such as this." [Id. 356 U.S. at page 376, 78 S.Ct. at page 822.]

I do not leave out of consideration the fact that in Sherman the Supreme Court avoided the problem of judging credibility by resting its conclusion that the defendant was entrapped as a matter of law solely upon testimony of prosecution witnesses. In the instant case, the evidence that the Government agents drew appellant back into drug addiction comes from appellant whose credibility may, of course, be questioned. In my opinion,

however, the circumstances not only justify but require a resolution of any doubts in favor of appellant.

Trent's testimony was essentially consistent with that of Agent Coursey and was corroborated in many respects by defense witnesses. The prosecution introduced no evidence to challenge his testimony that he came out of the hospital cured of his addiction. If that testimony were false, presumably the hospital's records or its staff members would have been available to contradict it. No such evidence was produced. Appellant's testimony that he was lured back into addiction by Dorothy Washington, the special employee of the Narcotics Bureau, was likewise uncontradicted. It too could have been refuted, if untrue, simply by calling the special employee to the witness stand. But the prosecution not only failed to call her as a witness, it failed to cooperate in any way with the earnest efforts of appellant to locate her for the purpose of calling her as his witness to corroborate his testimony. Appellant's efforts to subpoena the special employee at the address of her rooming-house proved unavailing when the marshal reported that she had moved from that address. Appellant's grandmother testified that she had seen and talked to the special employee in the city ten days before the trial, but that, when she tried to reach her at the address to which Miss Washington was said to have moved the information proved false. The prosecu-

---

ance grew until the informer, claiming he was not responding to treatment, requested the defendant to secure narcotics for him. The defendant refused, became evasive, but finally capitulated to recurrent pleas. Although the Government attempted to show that the defendant's prior narcotics convictions demonstrated ready compliance, the Court found this insufficient to demonstrate predisposition. The Court pointed out that there was "no evidence that petitioner himself was in the [narcotics] trade." Id., 356 U.S. at page 375, 78 S.Ct. at page 822.

8. 356 U.S. at page 372, 78 S.Ct. at page 821.

In a concurring opinion Justice Frankfurter, joined by Justices Douglas, Harlan and Brennan, took issue with this rationale. He argued that "The courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be countenanced." Id. 356 U.S. at page 380, 78 S.Ct. 825. This view also covers this case. The "police conduct revealed [here] falls below standards, to which common feelings respond, for the proper use of governmental power." Id. 356 U.S. at page 382, 78 S.Ct. at page 825.

tion's only contribution to the search was to object to the *grandmother's testimony* concerning what the special employee had told her.

Considering Miss Washington's employment by the Government, the crucial role she played in making the Government's case, and the obvious importance of the testimony she could give, an attitude of malevolent neutrality did not discharge the prosecution's burden. Having failed to make the least effort to produce this critical witness or to facilitate appellant's search for her, the prosecution should not be permitted to challenge the presumption that the witness would have corroborated appellant's testimony.[9]

Concluding as I do that the circumstances disclosed by the record constitute entrapment as a matter of law, I would reverse the conviction and remand the case to the District Court for entry of a judgment of acquittal.

9. The prosecution's failure either to produce the special employee, to reveal her new address and the new name she had assumed, or to explain her unavailability entitles appellant, on due process grounds, to a new trial and, if the Government does not come forward with the required information or explanation, to an acquittal. Roviaro v. United States, 1957, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639. In Roviaro, the Supreme Court reversed a conviction because of the Government's refusal to disclose the identity of the informer to whom the accused had allegedly sold narcotics, notwithstanding the fact that the defendant very likely knew the informer's name and how to reach him (see dissenting opinion of Mr. Justice Clark). The special employee in the instant case surely played as central a role, especially as to the alleged entrapment and the second transaction, as that played by the informer in Roviaro. If "the fundamental requirements of fairness," 353 U.S. at page 60, 77 S.Ct. at page 628 required disclosure of the informant's name in Roviaro, they required the disclosure of Dorothy Washington's new name and address here.

I should add that even if the issue of entrapment were not resolved in favor of appellant as a matter of law I think the conviction should be reversed and the case remanded for a new trial because of the absence of a missing witness instruction, see note 9 supra, and also on the ground that, contrary to my brethren's conclusion, the entrapment issue was not submitted to the jury under appropriate instructions. The District Court failed to separate the element which the defendant must establish (*i. e.,* inducement) from that which the prosecution must prove beyond a reasonable doubt (*i. e.,* predisposition). The necessity for drawing this distinction to the jury's attention is fully discussed by Judge Learned Hand in United States v. Sherman, 2 Cir., 1952, 200 F.2d 880, and need not be elaborated here. I agree with Judge Hand that failure to give such instructions is "plain error." Fed.R.Crim.P. 52(b).

At the very least, I think appellant was entitled to a new trial on the ground that the jury was not given a missing witness instruction. The rule is that "[I]f a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavororable." Graves v. United States, 1893, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021. A "special employee" for the Government is a witness "peculiarly within [its] power to produce." See authorities collected in my dissenting opinion in Richards v. United States, 107 U.S.App.D.C. 197, 201, 275 F.2d 655, 659, certiorari denied, 1960, 363 U.S. 815, 80 S.Ct. 1253, 4 L.Ed.2d 1155. To put it mildly, special employee Washington was in a position "to elucidate the transaction."

Although the defendant did not request such an instruction, I think its omission is "plain error * * * affecting substantial rights." Fed.R.Crim.P. 52(b).